Filed 7/14/15 (unmodified opn. attached after Appendix A)

CERTIFIED FOR PUBLICATION

OPINION ON REMAND

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BILLY CHARLES WHITE,<br><br>    Defendant and Appellant. | D060969<br><br>(Super. Ct. No. SCD228290)<br><br>ORDER MODIFYING<br>DISSENTING OPINION<br><br>[NO CHANGE IN JUDGMENT OR<br>MAJORITY OPINION] |

THE COURT:

It is ordered that the dissenting opinion filed herein on June 18, 2015, be modified as follows:

1.  For the convenience of readers, attached as **Appendix A** is a complete version of the dissent, as modified by this order.

2.  On page 1, the following changes are made:

- The following sentence is added to the beginning of the first full paragraph:

I dissent to part B of the majority's opinion.

- Footnote 1, at the bottom of page 1, is split into two footnotes, which will require renumbering of all subsequent footnotes, and read as follows:

[1] All further statutory references are to the Penal Code.

[2] For clarity, I will use the same nomenclature as the majority (maj. opn. *ante*, at p. 16, fn. 3) in referring to the versions of section 261 of the Penal Code at issue in this case. "Former section 261" will refer to the version interpreted by the high court in 1941 in *Craig*, and "applicable section 261" will refer to the version under which defendant was charged.

- The numerical reference to footnote 1 at line 6, paragraph 1, is moved to line 5 between the words "Code," and "§" in the first parenthetical statutory reference.

- The numerical reference to footnote 2, paragraph 1, is inserted at line 6 at the end of the sentence beginning with the words "an unconscious person."

- A paragraph break is inserted following the second full sentence of the first paragraph, beginning with the words "The majority concludes subdivisions," and a sentence is added to that paragraph. The full paragraph now reads as follows:

The majority concludes subdivisions (a)(3) and (a)(4)(A) of applicable section 261 "do not define separate crimes and do not contain separate punishments," but rather "are simply separate ways in which the crime of rape can be committed under section 261." (Maj. opn. *ante*, at p. 23.) As a result, the majority strikes defendant's conviction on count 2, meaning defendant White now stands convicted of only one count of rape.

- The second full paragraph, beginning with "I dissent to part B" is replaced in its entirety with the following:

2

In doing so, the majority does not explain for the benefit of sentencing courts or for our high court (in connection with any forthcoming petition for review) *why* it struck count 2, as opposed to count 1, or *why* it did not merely consolidate defendant's two rape counts, as was done in *Craig*.[3] In any event, I note if our high court or another court in a habeas corpus proceeding should overturn defendant's conviction on count 1, White then would stand convicted of *no* counts of rape, despite the majority's conclusion in this case that substantial evidence supports *both* convictions.

- The third full paragraph, beginning with "With respect" is replaced

in its entirety with the following:

Based on Gonzalez and its discussion of *Blockburger v. United States* (1932) 284 U.S. 299, 304 (*Blockburger*), and based on *Craig* itself, I conclude that subdivisions (a)(3) and (a)(4)(A) of applicable section 261 require proof of different elements (i.e., the "elements test"), and, therefore, each subdivision constitutes an individual rape offense for which defendant may be separately charged and convicted. With respect to the actual holding of *Craig* (i.e., that rape and statutory rape constitute a "single outrage" to be sentenced as one crime), I conclude it was based on then-existing views of rape, which have since been abandoned, and that, in any event, the narrow holding of *Craig* was superseded when, among other actions, the Legislature adopted section 261.5. That statute set forth the separate crime of statutory rape, with a separate sentencing scheme. (Stats. 1970, ch. 1301, § 2.)

3. On page 5, the following changes occur:

- The first full paragraph beginning with "The majority, in my view"

is deleted.

- The following four paragraphs are added:

In urging a conclusion that violation of multiple subdivisions within subdivision (a) of section 261 are but one crime, my colleagues erroneously conclude the circumstances listed in those subdivisions have no significance except to describe conditions under which a crime of rape occurs. This premise merits close examination and rejection. We need not resort here to debate as to what the holding of *Craig* is, and is not. Nor do we need to debate whether, as my colleagues believe, rape always constitutes a single outrage against the victim whatever the circumstances

3

of the crime. We need only look at what our Legislature has done in enacting the version of section 261 applicable when defendant was charged, a statute I note is vastly different and expanded than the one interpreted by our high court in *Craig*. Examination of applicable section 261 leads me to conclude my colleagues establish an unwarranted and unwise reduction of the Legislature's intent in section 261.

It is true that subdivisions 1-7 within subdivision (a) of section 261 address the outrage of the same *physical violation*. However, it is clear to me that each such subdivision carves out an individual outrage or illegality *in addition to the physical act*. For example, in subdivision (3) the additional outrage is the advantage taken of the victim due to intoxication. In subdivision (4)(A), it is the advantage taken of an unconscious victim. The same may be said the other subdivisions. In subdivision (4)(C) the additional outrage is the perpetrator's use of fraud in fact. In (4)(D) it is the use of fraud to induce the victim to believe sexual penetration is necessary for a professional purpose when it is not. (See § 729.) In subdivision (6) it is the threat of retaliation against the victim or another. (See § 422.) In subdivision (7) the additional outrage is the use of a threat of incarceration, arrest or deportation. (See Bus. & Prof. Code, § 494.6, subd. (b).)

Thus, my colleagues' necessary conclusion only one outrage has occurred regardless of the circumstances described in subdivisions 1-7 of subdivision (a) ignores the clear legislative intent that each distinct circumstance enumerated in the statute is an outrage, not just against the victim, but as expressed by individual law enforcement goals and public policy considerations, society in general. As such, each circumstance is an additional element that must be plead and proved.

In disregarding the elements test, the majority relies exclusively on a "structure test" in concluding that applicable section 261 more closely resembles former section 261 than former section 288a. Relying on the structure of applicable section 261, the majority notes that a reader can only understand subdivision (3) or (4) of that statute by reading subdivision (a) of that statute, which, according to the majority, makes former section 288a "markedly different" than applicable section 261. (Maj. opn. *ante*, at p. 17.)

4. On page 6, the second full paragraph beginning with "Unlike the majority," and the third full paragraph beginning with "As I discuss" are combined into one paragraph, and now reads as follows:

4

Unlike the majority, I do not find *Smith* helpful. The case lacks any analysis on our issue and instead, merely quotes *Craig* for the rule it applied. Moreover, it is important to note that *Smith* modified the judgment to *strike*, as opposed to *condolidate*, the rape counts. Thus, the majority's apparent agreement with the disposition allowed in *Smith* would leave a sentencing court with multiple options. As I discuss in more depth *post*, this resulting state of confusion and inconsistency of sentences is one of the main reasons why I believe our Supreme Court abandoned use of the disposition applied here by the majority and by the court in *Smith*. Instead, the court has for decades required application of section 654, subdivision (a) when a defendant stands convicted of multiple offenses arising out of the same act.

5. On page 9, the first full paragraph beginning with "As indicated," under heading B, is replaced in its entirety with the following:

As indicated, I believe that *Gonzalez*, *Blockburger*, and *Craig* require use of the elements test; that defendant was properly charged and convicted of separate subdivisions of applicable section 261, subdivision (a); and that section 654 was thereafter properly applied. This should end the analysis. However, the ending is not so simple because we must deal with *Craig's* consolidation of two counts into one. My colleagues view this disposition in *Craig* as support for their conclusion that *Craig* requires we strike one of defendant's rape counts so that he stands convicted of only one count of rape.

6. On page 10, the first full paragraph beginning with "At the time of *Craig*," under subheading No. 1, is replaced in its entirety with the following:

At the time of *Craig*, the then-prevailing view of rape was that of a single form of "outrage" to the person and feelings of the victim, and, as such, a victim could not be "doubly outraged, once by force and once because of her tender years, but suffered only a single offence." (*People v. Mummert* (1943) 57 Cal.App.2d 849, 856-857, overruled in *Collins*, *supra*, 54 Cal.2d at p. 60.) Society's evolving view of rape teaches that in enacting separate subdivisions in applicable section 261, each governed by its own circumstances, the Legislature has recognized each subdivision as a separate and distinct offense with separate required elements.

7. On page 16, the following changes are made:

- The paragraph beginning with the words "Indeed, the majority's use of" is replaced in its entirety with the following:

  Indeed, the majority's use of *Craig* and *Smith* to strike one of defendant White's rape counts potentially leads to the unintended consequences expressly disapproved of in *Wright*. That is, if White's remaining rape conviction on count 1 is subsequently overturned, White would stand convicted of no counts of rape, despite the majority's findings in this case that substantial evidence supports convictions on both counts 1 *and* 2. Clearly, this is not a result intended by our Legislature, as reflected in sections 654, and 954, or by our Supreme Court, as reflected in *Pearson* and its progeny.

- A new paragraph, following the second full paragraph, is added and reads as follows:

- The majority's decision in this case striking a rape count also has unintended consequences with respect to other statutes and a defendant's sentence. For example, under certain circumstances, rape of an intoxicated victim (§ 261, subd. (a)(3)) subjects a defendant to a five-year enhancement. (§ 667.6, subds. (a) and (e)(1).) Similarly, section 667.61, subdivision (c)(1) requires sentence enhancement when other requirements of the statute are met and when a rape is committed *only* in violation of section 261, subdivision (a)(2) (i.e., force) *or* (a)(6) (i.e., threat of force). The majority fails to explain how in the face of such complications a court is to select which count it should strike. The majority renders such considerations of no importance.

- The paragraph beginning with the words "In my view" is replaced in its entirety with the following:

  In my view, instead of consolidating two rape counts based on a single act as in Craig, or striking one of the two rape counts as the majority in the instant case order, we are *compelled* to follow the rule set forth by our Supreme Court and a very long line of authority and stay punishment of one or more of such offenses under subdivision (a) of section 654, thus avoiding the risk of any unintended benefit to a defendant while preserving his or her right to be free of multiple punishment for the same act.

6

8. On page 17, heading C and the two subsequent paragraphs are deleted.


BENKE, Acting P. J.

# APPENDIX A

BENKE, J., Concurring and Dissenting.

I dissent to part B of the majority's opinion. As noted by the majority, our high court in this case previously granted the People's petition for review pending the court's decision in *People v. Gonzalez* (2014) 60 Cal.4th 533 (*Gonzalez*), after a majority of this court found pursuant to *People v. Craig* (1941) 17 Cal.2d 453 (*Craig*) that defendant White allegedly could not be convicted of *both* rape of an intoxicated person (Pen. Code,[1] § 261, subd. (a)(3); count 1) and rape of an unconscious person (Pen. Code, § 261, subd. (a)(4)(A); count 2).[2] The majority now reaffirms its previous holding in light of, or despite, *Gonzalez*.

The majority concludes subdivisions (a)(3) and (a)(4)(A) of applicable section 261 "do not define separate crimes and do not contain separate punishments," but rather "are simply separate ways in which the crime of rape can be committed under section 261." (Maj. opn. *ante*, at p. 23.) As a result, the majority strikes defendant's conviction on count 2, meaning defendant White now stands convicted of only one count of rape.

In doing so, the majority does not explain for the benefit of sentencing courts or for our high court (in connection with any forthcoming petition for review) *why* it struck count 2, as opposed to count 1, or why it did not merely consolidate defendant's two rape

---

[1]    All further statutory references are to the Penal Code.

[2]    For clarity, I will use the same nomenclature as the majority (maj. opn. *ante*, at p. 16, fn. 3) in referring to the versions of section 261 of the Penal Code at issue in this case. "Former section 261" will refer to the version interpreted by the high court in 1941 in *Craig*, and "applicable section 261" will refer to the version under which defendant was charged.

counts, as was done in *Craig*. In any event, I note if our high court or another court in a habeas court proceeding should overturn defendant's conviction on count 1, White then would stand convicted of *no* counts of rape, despite the majority's conclusion in this case that substantial evidence supports *both* convictions.

Based on *Gonzalez* and its discussion of *Blockburger v. United States* (1932) 284 U.S. 299, 304 (*Blockburger*), and based on *Craig* itself, I conclude that subdivisions (a)(3) and (a)(4)(A) of applicable section 261 require proof of different elements (i.e., the "elements test"), and, therefore, each subdivision constitutes an individual rape offense for which defendant may be separately charged and convicted. With respect to the actual holding of *Craig* (i.e., that rape and statutory rape constitute a "single outrage" to be sentenced as one crime), I conclude it was based on then-existing views of rape, which have since been abandoned, and that, in any event, the narrow holding of *Craig* was superseded when, among other actions, the Legislature adopted section 261.5. That statute set forth the separate crime of statutory rape, with a separate sentencing scheme. (Stats. 1970, ch. 1301, § 2.)

Finally, I conclude *Craig*'s consolidation of two counts into a single conviction is explained by concerns with regard to the then-existing sentencing system, and, in any event, the disposition in *Craig* has, for sound reasons, been abandoned by case law culminating with *In re Wright* (1967) 65 Cal.2d 650 (*Wright*), which interprets section 654 as requiring application of a stay where a defendant has been convicted of multiple crimes arising from the same act.

In summary, because *Craig* was bound by cultural views and sentencing concerns that no longer exist, I conclude the modern and primary importance of *Craig* is its clear

2

support for use of the elements test.  Therefore, I would affirm White's conviction on count 2 for violation of applicable section 261, subdivision (a)(4)(A) and, like the trial court, would apply section 654, subdivision (a) to stay sentence on that offense.

A.  *Because each count requires proof of at least one different element, defendant was properly convicted on counts 1 and 2.*

Our high court in *Gonzalez* considered a question similar to the one presented in the instant case, namely, "whether a defendant may, consistently with . . . section 954, be convicted of both oral copulation of an unconscious person (§ 288a, subd. (f)) and oral copulation of an intoxicated person (*id.*, subd. (i)) based on the same act." (*Gonzalez, supra*, 60 Cal.4th at p. 535, fn. omitted.)  As noted, a majority of our court had used *Craig* to preclude multiple convictions under former section 288a.[3]  (*Ibid.*)

In reversing, the court in *Gonzalez* did not disapprove of *Craig*, but neither did it approve of *Craig* in the manner suggested by the majority.  Notably, *Gonzalez* points out that *Craig* "acknowledged that '"[a] defendant may be convicted of two separate offenses arising out of the same transaction when each offense is stated in a separate count and when the two offenses differ in their necessary elements and one is not included *within the other*."'"  (*Gonzalez, supra*, 60 Cal.4th at p. 539, quoting *Craig, supra*, 17 Cal.2d at p. 457.)  Although the court in *Gonzalez* examined the structure of section 288a and noted that each subdivision was drafted to be self-contained by prescribing a specific punishment, the court also noted this fact "*supports* the view that each describes an

_____

3    Section 288a was amended effective September 9, 2013.  (Stats. 2013, ch. 282, § 1.)  The amendment did not alter subdivisions (f) or (i) under which the defendant in *Gonzalez* was charged and convicted.  For clarity, I will refer to the version of section 288a under which the defendant in *Gonzalez* was convicted as "former section 288a."

independent offense, and therefore section 954 is no impediment to a defendant's conviction under more than one such subdivision for a single act." (*Gonzalez*, at p. 539, italics added.) It is clear to me that, although *Gonzalez* uses the separate punishments of section 288a as *support* for its conclusion there are multiple offenses in the subdivisions of section 288a, it did not by this statement create a *requirement* that a separate punishment must be prescribed in each subdivision in order to charge and convict a defendant of multiple subdivisions that already require different elements. Holding, as my colleagues do, that *Gonzalez* imposes an additional requirement of separate punishment for each such subdivision creates an inconsistency in *Gonzalez* that is not there and marginalizes or perhaps eliminates altogether the elements test that is clearly set forth in that case and in *Craig*.

In concluding *Gonzalez* applies an elements test rather than what I will call a "structure test," I find it significant that *Gonzalez*'s analysis rests in large part on *Blockburger*, *supra*, 284 U.S. 299. (*Gonzalez*, *supra*, 60 Cal.4th at p. 539, citing *Blockburger*, *supra*, 284 U.S. at p. 304.) Briefly, in *Blockburger*, the defendant was charged and convicted in count 3 with selling eight grains of morphine "not in or from the original stamped package" and in count 5 with the sale (as charged in count 3) of that drug not made pursuant to a "written order of the purchaser," as was required. (*Blockburger*, at p. 301.) The defendant there argued there was but one sale to the same purchaser, and, therefore, he committed only one offense for purposes of counts 3 and 5. (*Id.* at p. 304.)

In rejecting this argument, *Blockburger* states: "The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the

4

test to be applied to determine whether there are two offenses or only one, is whether *each provision requires proof of a fact which the other does not.*" (*Blockburger*, *supra*, 284 U.S. at p. 304, italics added; see *Gonzalez*, *supra*, 60 Cal.4th at p. 539, quoting this language in *Blockburger*.) As a result, the United States Supreme Court concluded there were two offenses, despite the fact counts 3 and 5 involved only one sale of morphine. (*Blockburger*, at p. 304.)

I note, there is no mention in *Blockburger* of any requirement there must be separate punishments, in addition to separate elements, in determining whether the same act or transaction gives rise to independent offenses when multiple statutory provisions of a criminal statute are violated. All that is required for separate charging and conviction is that the elements are different and one subdivision is not necessarily included within the other.

In urging a conclusion that violation of multiple subdivisions within subdivision (a) of section 261 are but one crime, my colleagues erroneously conclude the circumstances listed in those subdivisions have no significance except to describe conditions under which a crime of rape occurs. This premise merits close examination and rejection. We need not resort here to debate as to what the holding of *Craig* is, and is not. Nor do we need to debate whether, as my colleagues believe, rape always constitutes a single outrage against the victim whatever the circumstances of the crime. We need only look at what our Legislature has done in enacting the version of section 261 applicable when defendant was charged, a statute I note is vastly different and expanded than the one interpreted by our high court in *Craig*. Examination of applicable section

5

261 leads me to conclude my colleagues establish an unwarranted and unwise reduction of the Legislature's intent in section 261.

It is true that subdivisions (1)-(7) within subdivision (a) of section 261 address the outrage of the same *physical violation*. However, it is clear to me that each such subdivision carves out an individual outrage or illegality *in addition to the physical act*. For example, in subdivision (3) the additional outrage is the advantage taken of the victim due to intoxication. In subdivision (4)(A), it is the advantage taken of an unconscious victim. The same may be said of the other subdivisions. In subdivision (4)(C), the additional outrage is the perpetrator's use of fraud in fact. In (4)(D), it is the use of fraud to induce the victim to believe sexual penetration is necessary for a professional purpose when it is not. (See § 729.) In subdivision (6), it is the threat of retaliation against the victim or another. (See § 422.) In subdivision (7), the additional outrage is the use of a threat of incarceration, arrest or deportation. (See Bus. & Prof. Code, § 494.6, subd. (b).)

Thus, my colleagues' necessary conclusion only one outrage has occurred regardless of the circumstances described in subdivisions (1)-(7) of section 261, subdivision (a) ignores the clear legislative intent that each distinct circumstance enumerated in the statute is an outrage, not just against the victim, but as expressed by individual law enforcement goals and public policy considerations, society in general. As such, each circumstance is an additional element that must be plead and proved.

In disregarding the elements test, the majority relies exclusively on a "structure test" in concluding that applicable section 261 more closely resembles former section 261

6

than former section 288a. Relying on the structure of applicable section 261, the majority notes that a reader can only understand subdivision (3) or (4) of that statute by reading subdivision (a) of that statute, which, according to the majority, makes former section 288a "markedly different" than applicable section 261. (Maj. opn. *ante*, at p. 17.)

I find no help in this comparison because I note that subdivision (a) of former section 288a is the only subdivision within that statute to define what "oral copulation" means: "Oral copulation is the act of copulating the mouth of one person with the sexual organ or anus of another person." (Former § 288a, subd. (a).) Subdivisions (b) through (k) of former section 288a then rely on that definition to define the various circumstances under which the crime of oral copulation can be committed. This is not unlike subdivisions (1) through (7) of subdivision (a) of applicable section 261, which must be read and considered in connection with subdivision (a), defining rape.

Nor do I find persuasive the case law relied upon by the majority.

In support of its holding, the majority relies on *People v. Smith* (2010) 191 Cal.App.4th 199 (*Smith*). Briefly, much like White here, the defendant in *Smith* was convicted of rape of an intoxicated person and rape of an unconscious person. (*Id.* at p. 201.) Relying on *Craig*, the *Smith* court summarily concluded both of the defendant's convictions could not stand "because 'only one punishable offense of rape results from a single act of intercourse, though it may be chargeable in separate counts when accomplished under the varying circumstances specified in the subdivisions of [former] section 261 of the Penal Code.'" (*Smith*, at p. 205, quoting *Craig*, *supra*, 17 Cal.2d at p. 458.)

Unlike the majority, I do not find *Smith* helpful. The case lacks any analysis on our issue and instead merely quotes *Craig* for the rule it applied. Moreover, it is important to note that *Smith* modified the judgment to *strike*, as opposed to *condolidate*, the rape counts. Thus, the majority's apparent agreement with the disposition allowed in *Smith* would leave a sentencing court with multiple options. As I discuss in more depth *post*, this resulting state of confusion and inconsistency of sentences is one of the main reasons why I believe our Supreme Court abandoned use of the disposition applied here by the majority and by the court in *Smith*. Instead, the court has for decades required application of section 654, subdivision (a) when a defendant stands convicted of multiple offenses arising out of the same act.

The majority also relies on *People v. Maury* (2003) 30 Cal.4th 342 (*Maury*) and *People v. Collins* (1960) 54 Cal.2d 57 (*Collins*) to support its conclusion that violation of multiple subdivisions of subdivision (a) of applicable section 261 by the same act or transaction involves only one offense. (Maj. opn. *ante*, at p. 22.) As relevant to my discussion, the issue in *Maury* was whether a defendant's due process rights were violated when he was charged with rape "'by means of force and fear of immediate and unlawful bodily injury,'" and when the jury was instructed the defendant could be guilty of rape if he accomplished the sexual intercourse with the victim "'by means of force, *violence*, or fear of immediate and unlawful bodily injury.'" (*Maury*, at p. 427, italics added.) In rejecting this argument, the *Maury* court cited *Collins* for the proposition that "rape by means of violence is *not* a different offense from rape by means of force or fear," but

8

rather were terms that "merely describe[d] different circumstances under which an act of intercourse may constitute the crime of rape." (*Maury*, at p. 427.)

*Maury*, however, offers no support for the proposition that the various subdivisions in applicable section 261 comprise merely one offense of rape because I note that "force," "violence" or "fear of immediate and unlawful bodily injury" all appear under the *same* subdivision—(a)(2)—of applicable section 261. Likewise, the holding in *Collins*—affirming a conviction of statutory rape under an information charging a defendant with forcible rape—has been abrogated as a result of "legislative recasting" of former section 261. (*Gonzalez*, *supra*, 60 Cal.4th at p. 540; see *People v. Chapman* (1975) 47 Cal.App.3d 597, 604, fn. 3.) Neither *Maury* nor *Collins* supports a continued *Craig*-type analysis used by the majority in circumstances such as those presented in the instant case.

Finally, the majority opinion leads to the conclusion that the Legislature intended to treat the sex crimes of rape and oral copulation differently, such that a defendant who commits oral copulation of an intoxicated and unconscious person can be guilty of two offenses, whereas a defendant who commits rape of an intoxicated and unconscious person can be guilty of only one offense. I do not agree that the Legislature intended such a result. Applying the elements test consistently to both statutes prevents this disparity. Because we can assume the Legislature was aware of this test and its settled application in the law, we need not challenge the Legislature to make itself more clear on this point or solve a problem that does not exist.

Applying the elements test here, I conclude that White committed two separate offenses when he was found guilty in counts 1 and 2 of rape of an intoxicated person and rape of unconscious person, respectively, as clearly each count required proof of a different element and each defined a different way in which the act of rape was committed.[4] I find the majority's abandonment of the elements test and exclusive reliance on a "structure test" not only confusing and likely to cause mischief,[5] but also contrary to *Gonzalez*.

---

[4] Under applicable section 261, subdivision (a)(3), the crime of rape occurs "[w]here a person is prevented from resisting [the act of sexual intercourse accomplished with a person not the spouse of the perpetrator] by any intoxicating or anesthetic substance, or any controlled substance, and this condition was known, or reasonably should have been known by the accused." (§ 261, subd. (a)(3).) However, under subdivision (a)(4) of applicable section 261, the crime of rape occurs "[w]here a person is at the time unconscious of the nature of the act, and this is known to the accused. As used in this paragraph, 'unconscious of the nature of the act' means incapable of resisting [the act of sexual intercourse accomplished with a person not the spouse of the perpetrator] because the victim meets any one of the following conditions: [¶] (A) Was unconscious or asleep." (§ 261, subd. (a)(4).) Clearly, subdivisions (a)(3) and (a)(4)(A) are comprised of different elements, which supports the conclusion they are independent offenses.

[5] I note our high court recently granted the People's petition for review in *People v. Vidana*, review granted April 1, 2015, S224546, which involved the issue of whether larceny and embezzlement were separate and distinct offenses under *Gonzalez*. Similarly, the Court of Appeal just granted rehearing on our exact issue in *People v. Soria*. (*People v. Soria* (C070238, rehg. granted Mar. 16, 2015).) In addition, Division Three of our court recently decided *People v. Wilson* (2015) 234 Cal.App.4th 193, 199 by relying in part on *Gonzalez* and *Craig*, when it found the Legislature did not intend to create two different crimes within the meaning of section 422 (i.e., making a criminal threat). In my view, these cases as well as others recently decided show the difficulty of applying a *Craig*-type analysis, as that case is interpreted by the majority, in circumstances such as those presented in the instant case.

B. *Penal Code section 654 and the post-Craig jurisprudential development of that statute govern this case.*

As indicated, I believe that *Gonzalez*, *Blockburger*, and *Craig* require use of the elements test; that defendant was properly charged and convicted of separate subdivisions of applicable section 261, subdivision (a); and that section 654 was thereafter properly applied. This should end the analysis. However, the ending is not so simple because we must deal with *Craig's* consolidation of two counts into one. My colleagues view this disposition in *Craig* as support for their conclusion that *Craig* requires we strike one of defendant's rape counts so that he stands convicted of only one count of rape.

In my view, *Craig* is a case with a particularly complex identity. I would not conclude it has been overruled nor would I agree it should be overruled. However, I do believe it was compelled to rest on a culture that no longer exists, and the serious problem of multiple punishment it then faced has long since been resolved. I am left with the conclusion, discussed *ante* in section A, that *Craig's* significance is its application of the elements test.

1. <u>The culture and law regarding the crime of rape at the time of *Craig*</u>

At the time of *Craig*, the then-prevailing view of rape was that of a single form of "outrage" to the person and feelings of the victim, and, as such, a victim could not be "doubly outraged, once by force and once because of her tender years, but suffered only a single offence." (*People v. Mummert* (1943) 57 Cal.App.2d 849, 856-857, overruled in *Collins*, *supra*, 54 Cal.2d at p. 60.) Society's evolving view of rape teaches that in enacting separate subdivisions in applicable section 261, each governed by its own

11

circumstances, the Legislature has recognized each subdivision as a separate and distinct offense with separate required elements.

Moreover, in finding that former section 261 defined but one crime, the court in *Craig* relied on the express language of the former statute, which stated that rape occurred "under *either* of the following circumstances." (Former § 261, italics added.) The term "either" connotes the choice between "one or the other." (Random House Unabridged Dict. (2d ed. 1993) p. 625.) The "either of" language in the former statute certainly lent the statute to the interpretation adopted in *Craig*.

However, the "either of" language is no longer in subdivision (a) of section 261— it was replaced with the word "any"—and rape may now be accomplished by any of the enumerated acts. The term "any" connotes "one or more." (Random House Unabridged Dict., *supra*, at p. 96.) Significantly, this change was made by the same bill that extended the protection of our rape statute, for the first time, to men. (Stats. 1979, ch. 994, § 1, p. 3383.) I believe these changes, coupled with the Legislature's earlier separation of statutory rape from the main rape statute, should be interpreted as the Legislature's abandonment of antiquated views represented in the law of rape as it existed when *Craig* was decided and, hence, at the time of the narrow holding of the court in that case. I find no rational reason to accept the majority's revival of those abandoned views.

2. The sentencing process at the time of *Craig*

*Craig* also was faced at the time with resolving a serious sentencing concern that no longer exists, specifically how a defendant should be sentenced for multiple convictions arising out of a single act. At the time of *Craig*, the State Board of Prison

12

Terms and Paroles (Board) was responsible for fixing the definite sentence term of defendants. The defendant in *Craig* was faced with *two judgments* for the same offense. The court sought to eliminate potential confusion and the prejudice of multiple punishment to the defendant if the Board saw there were two judgments and did not realize there was but a single act involved. The court solved this specter of multiple punishment by consolidating the judgments to ensure the Board was not confused and the defendant was not punished twice for the same act. (*Craig*, *supra*, 17 Cal.2d at pp. 458-459.)

Neither before nor immediately after *Craig* did section 654[6] provide any guidance regarding how to punish an act or omission made punishable by different provisions of the statute. Although, like the current version of section 654, the former version of that statute precluded multiple *punishment*, and while section 654, subdivision (a) now provides that the provision setting the longest potential term of imprisonment applies, there was, and is, no express provision in the statute allowing for a stay to avoid multiple punishment for crimes arising out of the same criminal act. Thus, clearly at the time

---

6      Former section 654, which was applicable when *Craig* was decided, provided: "An act or omission which is made punishable in different ways by different provisions of this Code may be punished under either of such provisions, but in no case can it be punished under more than one; an acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other. In the cases specified in Sections 648, 667 and 668, the punishments therein prescribed must be substituted for those prescribed for a first offense, if the previous conviction is charged in the indictment and found by the jury."

Section 654 was amended in 1976 to reflect the current version of the statute: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."

13

*Craig* was decided, there was a serious need to carve out a uniform sentencing tool that would consistently avoid multiple punishment for the same act.

In understanding the resolution of the sentencing problem facing our courts at the time of *Craig,* I find particularly useful the decision of our high court in *People v. Pearson* (1986) 42 Cal.3d 351 (*Pearson*), which fully discusses the development of section 654 jurisprudence. That discussion leads me to conclude the sentencing disposition in *Craig* has been disapproved.

In *Pearson*, the court notes: "Some of our earlier decisions held that the imposition of concurrent sentences sufficiently protected the defendant from multiple punishment because he would be serving each of his sentences simultaneously. (See, e.g., *People v. Kynette* (1940) 15 Cal.2d 731, 761-762 [(*Kynette*)].) In other cases, however, we refused to affirm multiple convictions because of the possibility that such convictions would disadvantage the defendant when the Adult Authority fixed the date he would ultimately be released from prison. (See, e.g., *People v. Brown* (1958) 49 Cal.2d 577, 593; *People v. Logan* [(1953)] 41 Cal.2d 279, 290-291; cases cited in *People v. Smith* [(1950)] 36 Cal.2d 444, 448.) In *Neal v. State of California* [(1960)] 55 Cal.2d 11, we went so far as to indicate that multiple convictions were invalid per se. (*Id.* at p. 19 ['If only a single act is charged as the basis of the multiple convictions, only one conviction can be affirmed.'].)

"Our later cases, however, reaffirmed that section 654 bars multiple punishment, not multiple conviction. (*People v. Tideman* (1962) 57 Cal.2d 574, 586–587; *People v. McFarland* (1962) 58 Cal.2d 748, 762-763.) In *McFarland* we explained: 'With respect to the procedure to be followed on appeal where double punishment has been erroneously

imposed, it should be stressed that section 654 proscribes double punishment, not double conviction; conduct giving rise to more than one offense within the meaning of the statute may result in initial conviction of both crimes, only one of which, the more serious offense, may be punished.  [Citation.]  The appropriate procedure, therefore, is to eliminate the effect of the judgment as to the lesser offense insofar as the penalty alone is concerned.'  (*Ibid.*)

"In *People v. Niles* (1964) 227 Cal.App.2d 749, 756 [(*Niles*)], the Court of Appeal determined that the proper method of eliminating the punitive consequences of multiple convictions was to stay execution of sentence for all but one conviction arising out of each act or indivisible course of conduct.  This procedure was developed to avoid the potentially unfair consequences to the state of refusing to allow multiple convictions: 'if [a trial court] dismisses the count carrying the lesser penalty, and the conviction on the remaining count should be reversed on appeal, the defendant would stand with no conviction at all.'  (*Ibid.*)

"Soon after *Niles*, this court decided *In re Wright* (1967) 65 Cal.2d 650, in which we approved of the procedure the *Niles* court had developed.  In *Wright* we reaffirmed the rule that section 654 does not prohibit multiple convictions, but also declared that it *does* bar concurrent sentences for such convictions.  We reasoned that concurrent sentences still amounted to punishment under more than one provision, prohibited under section 654, and could prejudice the defendant in various ways:  'Under the habitual criminal statute [citation] defendant would be prejudiced by erroneous concurrent sentences for an offense subject to a lesser penalty but available to support a determination of habitual criminality . . . and an offense subject to a greater penalty but

15

not listed in the habitual criminal statute . . . . [¶] 'Erroneous concurrent sentences for petty theft, with a maximum term of six months in jail [citation], and issuing a check not exceeding $100 without sufficient funds, with a maximum term of one year in jail [citation], would be detrimental to a defendant who suffered a *subsequent* conviction because he would be subject to the increased minimum punishments provided by Penal Code section 666 for one who has been previously convicted of petty theft and "served a term therefor in any penal institution."' (*Id.* at p. 654, fn. 2, italics added.)

"In *Wright* we therefore balanced the potential windfall to the defendant of reversing multiple convictions against the prejudice to him of allowing sentencing for such convictions. We then determined that the procedure of staying execution of sentence for multiple convictions instead of reversing such convictions 'reasonably reconciles the policies involved in applying section 654 to protect the rights of both the state and the defendant,' and follows logically from the section 654 prohibition against punishing the defendant under more than one provision based on a single criminal act. (*Id.* at pp. 655–656, fn. 4.)" (*Pearson*, *supra*, 42 Cal.3d at pp. 359-360.)

As explained by *Pearson*, I believe *Craig* reflects a sentencing problem that plagued our courts prior to *Wright*. It was a sentencing problem that saw inconsistent rulings by our Supreme Court. Indeed, a year before *Craig* was decided, as *Pearson* noted the *Kynette* court applied former section 654 to require sentences to run concurrently in order to avoid double punishment after a defendant was convicted of attempted murder, assault with intent to murder and the malicious use of explosives, all of which convictions the court noted were "traceable to and [were] the direct result of the placing of a bomb in the automobile of the victim." (See *Kynette*, *supra*, 15 Cal.2d at

16

pp. 761-762, overruled on another ground as stated in *People v. Snyder* (1958) 50 Cal.2d 190, 197.)  In reaching its decision, *Kynette* noted "it would have been more in conformity with the legislative intent expressed in section 654 of the Penal Code to preclude more than one punishment for an act 'punishable in different ways by different provisions of this code,' if the court below had caused all three sentences to run concurrently rather than two of them, with the third running consecutively."  (*Kynette*, at p. 762.)  For reasons specific to each case, in *Kynette* the response of the court was to apply concurrent sentences, while in *Craig* the response was to consolidate the multiple convictions.[7]

Once *Niles* was decided in 1964, which introduced the concept of staying sentence and punishment for convictions otherwise appropriate under former section 654, clearly it was no longer necessary to consolidate multiple offenses into a single conviction or to ensure sentences from multiple convictions ran concurrently, as was the case in the 1940's when *Craig* and *Kynette* were decided.  In light of this, I view *Craig* and *Kynette* as cases that are part of the history of inconsistency so meticulously set forth in *Pearson*. As I have noted, it is not an inconsistency I believe merits any argument that *Craig*

---

[7]     As recognized by *Gonzalez*, the first count in *Craig* alleged the defendant committed the rape with force and violence, in violation of subdivision (3) of former section 261, and the second count, "*after alleging* [*in the information*] *that it was* '"*a different statement of the same offense*"' [citation] charged statutory rape of a child below the age of consent, in violation of former section 261, subdivision 1."  (*Gonzalez*, *supra*, 60 Cal.4th at p. 538, italics added, quoting *Craig*, *supra*, 17 Cal.2d at p. 454.)  Thus, perhaps *Craig* was decided differently than *Kynette* as a result of how the defendant in *Craig* was charged.

17

should be overturned; rather, it is inconsistency attributable to a sentencing concern that has been remedied.

Unfortunately, the approach now employed by the majority, like the option to strike presented in *Smith*, negate much of the historical progress noted in *Pearson* and deliver us back to the inconsistency and confusion that existed before implementation of the stay procedure engrafted onto section 654 by *Niles* and approved by *Wright*.

Indeed, the majority's use of *Craig* and *Smith* to strike one of defendant White's rape counts potentially leads to the unintended consequences expressly disapproved of in *Wright*. That is, if White's remaining rape conviction on count 1 is subsequently overturned, White would stand convicted of no counts of rape, despite the majority's findings in this case that substantial evidence supports convictions on both counts 1 *and* 2. Clearly, this is not a result intended by our Legislature, as reflected in sections 654, and 954, or by our Supreme Court, as reflected in *Pearson* and its progeny.

The majority's decision in this case striking a rape count also has unintended consequences with respect to other statutes and a defendant's sentence. For example, under certain circumstances, rape of an intoxicated victim (§ 261, subd. (a)(3)) subjects a defendant to a five-year enhancement. (§ 667.6, subds. (a) and (e)(1).) Similarly, section 667.61, subdivision (c)(1) requires sentence enhancement when other requirements of the statute are met and when a rape is committed *only* in violation of section 261, subdivision (a)(2) (i.e., force) *or* (a)(6) (i.e., threat of force). The majority fails to explain how in the face of such complications a court is to select which count it should strike. The majority renders such considerations of no importance.

18

In my view, instead of consolidating two rape counts based on a single act as in *Craig*, or striking one of the two rape counts as the majority in the instant case order, we are *compelled* to follow the rule set forth by our Supreme Court and a very long line of authority and stay punishment of one or more of such offenses under subdivision (a) of section 654, thus avoiding the risk of any unintended benefit to a defendant while preserving his or her right to be free of multiple punishment for the same act.

In sum, I conclude White was properly convicted in counts 1 and 2 of rape of an intoxicated person (former § 261, subd. (a)(3)) and rape of an unconscious person (*id.*, subd. (a)(4)(A)).  I further conclude White's punishment in connection with count 2 was properly stayed under section 654, subdivision (a).  In all other respects, I agree with the majority decision.

BENKE, Acting P. J.

CERTIFIED FOR PUBLICATION

OPINION ON REMAND


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D060969 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD228290) |
| BILLY CHARLES WHITE, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County, Frank A. Brown, Judge.  Affirmed as modified.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, and A. Natasha Cortina, Deputy Attorney General, for Plaintiff and Respondent.

A jury found Billy Charles White guilty of rape of an intoxicated person (Pen. Code,[8] § 261, subd. (a)(3); count 1) and of rape of an unconscious person (§ 261, subd. (a)(4)(A); count 2).  The trial court sentenced White to three years in state prison and ordered him to register as a sex offender.

White contends the evidence is insufficient to prove under section 261 that when he engaged in sexual intercourse with the victim, he knew the victim was unable to resist because of intoxication (count 1) or because the victim was unconscious of the nature of the act of intercourse (count 2).  White also contends the trial court prejudicially erred by refusing both to instruct the jury on mistake of fact and to grant his new trial motion based on juror misconduct.  Finally, White contends the trial court abused its discretion when it denied him probation.

In addition to these contentions, on our own motion we requested supplemental briefing from the parties whether White's convictions on counts 1 and 2 should be consolidated under *People v. Craig* (1941) 17 Cal.2d 453 (*Craig*) and its progeny into a single conviction given there was a single act of sexual intercourse.

In an unpublished opinion filed April 10, 2013, we rejected White's contentions on appeal.  After considering the supplemental briefing of the parties, we concluded that White was not properly convicted both on counts 1 and 2 and further, that the judgment must be modified to reflect only one conviction for violation of section 261.

---

[8]     All statutory references are to the Penal Code.

Our high court granted the People's petition for review, but deferred further action on the matter pending consideration and disposition of a related issue in *People v. Gonzalez* (2014) 60 Cal.4th 533 (*Gonzalez*). After the court issued its opinion in that matter, it transferred the matter to this court with directions to reconsider the case in light of *Gonzalez*. We have complied with the Supreme Court's direction and affirm the judgment as modified. Specifically, we conclude that *Gonzalez* does not hold that White can be convicted of both rape of an intoxicated person and rape of an unconscious person based on a single act of intercourse under section 261. As such, we strike the second count for rape. We otherwise affirm the judgment as modified.

FACTUAL AND PROCEDURAL BACKGROUND

On February 14, 2010, White asked the victim to go out for Valentine's Day. White knew the victim from a local bar White frequented, where the victim worked as a bartender. White and the victim in the past had participated in some group activities, including taking a trip to Las Vegas with other employees and patrons of the bar. Although the victim refused to go out alone with White on Valentine's Day, she agreed to go out in a group that included White.

That night, the victim met White at the local bar where the victim worked. Before she met up with White, the victim had dinner with a friend. During dinner the victim consumed one beer.

At about 9:00 p.m., the victim drove to downtown San Diego with White and John Jacoby (John), another regular from the bar where the victim worked. The victim dropped off White at a hotel where White planned to stay. However, the victim had not

3

intended to stay the night at the hotel. After the victim parked her car in the hotel parking lot, they headed downtown to some clubs but found the lines to enter too long and the cover charge for admission too expensive. The victim next contacted a friend who worked at a "gentlemen's club" (club).

The three of them went to the club at about 10:30 p.m., sat in the "V.I.P." section and purchased a bottle of vodka to share. While at the club, the group was joined by John's brother, Joey Jacoby (Joey), Joey's girlfriend, Jamey Booth (Jamey), and the victim's former boyfriend. White and John each received a private or "lap" dance at the club. With the exception of the victim's former boyfriend, the group stayed at the club until it closed at about 2:00 a.m. The victim testified she consumed at least four vodka drinks while at the club. The victim also testified she did not remember leaving the club; instead, her last memory that night was being told by club employees that the club was closing. Her next memory was waking up at 5:30 a.m. in the hotel room after "somebody roll[ed] off of [her]."

The victim testified that on the night of the attack, she dreamt she was being touched and kissed. The victim also testified that when she awakened she looked at the clock and realized then she was in a hotel room and that somebody actually had been touching her, including her vagina and breasts. At that moment, the victim knew somebody had intercourse with her while she had been in a "dream state." The victim testified she remember saying "no" to intercourse, but could not remember whether she was actually saying "no" out loud to her attacker or was saying it "inside [her] head."

4

The victim testified she saw John sleeping on a bed to her left. The victim still had on her dress and sweater but her dress was "scrunched up" like a shirt, her underwear was missing and her bottom half was exposed. The victim saw White in bed next to her, wearing an undershirt with his pants down. White appeared to be sleeping.

The victim got up from the bed, found her underwear and frantically went over to John. The victim shook John to wake him. The victim next grabbed a few of her belongings and ran out of the room into the hallway, where she sat crying.

John came to the victim's assistance. The victim told John she had been raped. Because of the noise, hotel security approached the victim and John in the hallway and told them either to leave the hotel or go back inside their room. The victim did not tell security she had been raped because she was embarrassed. John drove the victim home.

The victim testified that once home she felt "completely lost" emotionally. She could not remember going to the hotel the night before or how she ended up sleeping in the hotel room. The day after the attack, the victim told her roommate what had happened, who called police. The victim was taken to a clinic for an evidentiary examination.

The examination revealed abrasions on the peri-hymenal area of the victim, both left and right, and lacerations on the victim's posterior fourchette and the fossa navcularis. The findings were consistent with the victim being asleep or unconscious and not physically aroused at the time of sexual penetration.

The victim's roommate testified she could hear the victim crying inside her room most of the day following the attack, and the victim appeared scared and shaken up. The victim's

5

roommate also testified that more than a day after the attack, the victim was still crying and was wearing the same clothes she had worn on the night of the assault.

Jamey testified on the night of the attack the victim appeared intoxicated as she was having trouble walking. The victim's former boyfriend testified before he left the club that night he offered to take the victim home because in his opinion she was "totally wasted."

As the club closed, White and the victim left in a cab and returned to the hotel. Joey and Jamey were outside the club talking when they saw White and the victim leave. Joey and Jamey were surprised the victim and White left in a cab because they believed Jamey was going to drive them all back to the hotel. Joey and Jamey waited outside the club for John and they too went back to the hotel.

Security camera footage from the hotel showed White helping the victim out of the cab and holding her up as they walked in and around the hotel after returning from the club. In addition, the footage shows the victim at one point veering off and stumbling away from White after she dropped her purse on the floor.

Once at the hotel, Joey, John, and Jamey by happenstance met up with White and the victim. Joey observed the victim "stumbling around" and saw her walk into the men's restroom. John similarly testified the victim needed assistance walking. John had been with the victim in the past when they had drunk alcohol and he testified he had never seen her as intoxicated as she was that night.

The entire group next went to White's hotel room. Jamey helped the victim into the room and put the victim on one of the two beds. White and John left to find more alcoholic

6

beverages. Joey, Jamey, and the victim remained in the room. Joey testified that one minute the victim appeared "kind of fine" and the next minute she was "kind of like passing out." As they talked, Joey saw the victim lying on the floor of the hotel room, in between the two beds, "kind of out of it." Joey and Jamey helped the victim back on the bed, and although the victim tried to sleep, Joey testified the victim kept using the bathroom ostensibly to vomit.

At about that time, John and White returned without any alcohol. They then decided to get something to eat. Because the victim was intoxicated, the group decided she should stay behind and "sleep it off." Joey then drove to a restaurant where he and Jamey dropped off John and White. Joey and Jamey then drove home to Joey's house.

John testified that he and White went back to the club after they finished eating in an attempt to retrieve White's cell phone, which White had left at the club. John and White returned to the hotel at about 3:40 a.m. The victim was sleeping on one of the two beds. While John was using the bathroom, White climbed on the bed where the victim was sleeping. John turned out the light and went to sleep in the other bed.

John testified he was awakened by the victim. She appeared "very scared" and was crying. Outside the room in the hallway, the victim told John that White had sexually assaulted her. John went back in the room to obtain the victim's purse and her other belongings. John saw White under the covers in the bed where the victim had been sleeping. John told White that the victim said White had sexually assaulted her. In response, White told John that the victim "had been begging [White] for it."

7

Photos from the hotel security camera showed the victim and John leaving the hotel. John testified that at times he had to carry the victim as they walked to her car because she was distraught.

## DISCUSSION

### A. *Sufficiency of the Evidence in Counts 1 and 2*

White does not contest that he engaged in sexual intercourse with the victim. He also does not contest the victim had been "partying and drinking" on the night of the alleged assault and was "drunk" when the group reached the hotel at about 2:30 a.m. However, White contends there is insufficient evidence he knew or should have known that the victim was prevented from or unable to resist the act of intercourse due to either intoxicating substances (§ 261, subd. (a)(3)) or unconsciousness (*id.*, subd. (a)(4)(A)) because there allegedly is no evidence of the victim's condition at about 5:30 a.m. that morning when sexual intercourse occurred, including evidence of whether she was awake or sufficiently conscious at the time such that White would know or reasonably know she was unable to resist.

### 1. Applicable Law

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We resolve all conflicts in the evidence and questions of credibility in favor of the verdict, and indulge every reasonable inference the jury could draw from the evidence. (*People v.*

8

*Autry* (1995) 37 Cal.App.4th 351, 358.)  Reversal on this ground is unwarranted unless " 'upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*Bolin, supra,* at p. 331; see also *People v. Mendez* (2010) 188 Cal.App.4th 47, 56.)  This standard of review is the same in cases involving circumstantial evidence.  (*People v. Stanley* (1995) 10 Cal.4th 764, 792.)

The jury here was properly instructed regarding the knowledge element to support a conviction under counts 1 and 2.  Specifically, with regard to count 1, rape of an intoxicated person, the People were required to prove that, among other elements, the defendant "knew or reasonably should have known that the effect of an intoxicating substance prevented the woman from resisting." (CALCRIM No. 1002, as modified.)  The jury was also instructed that a "person is prevented from resisting if he or she is so incapacitated that he or she cannot give legal consent.  In order to give legal consent, a person must be able to exercise reasonable judgment.  In other words, the person must be able to understand and weigh the physical nature of the act, its moral character and probable consequences.  Legal consent is consent that's given freely and voluntarily by someone who knows the nature of the act involved." (CALCRIM No. 1002.)

Finally, the jury was instructed regarding a defendant's actual and reasonable belief that a woman was capable of consenting to sexual intercourse, as a defense to the crime of rape: "The defendant is not guilty of this crime if he actually and reasonably believed that the woman was capable of consenting to sexual intercourse, even if that belief was wrong.  The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the woman was capable of consenting.  If the

9

People have not met this burden, then you must find the defendant not guilty."
(CALCRIM No. 1002.)

## 2. Analysis

Substantial evidence in the record supports the jury's finding that White knew or reasonably should have known that the victim was incapable of resisting due to intoxication. Indeed, the record shows that the victim consumed at least four alcoholic beverages between 10:30 p.m. and 2:00 a.m.; that the victim's last memory on the night of the attack was club employees telling her it was time to leave; that multiple witnesses testified the victim was having trouble walking on her own; that the victim's former boyfriend testified the victim was "totally wasted" at the club; that security camera footage from the hotel confirmed the victim was having trouble walking and was walking with the assistance of White; that the victim inexplicably dropped her purse while stumbling around inside the hotel; that once inside the hotel room, the victim "pass[ed] out"; that at some later point inside the hotel room, the victim fell off the bed and slept on the floor between the two beds; that the victim needed assistance getting back onto one of the beds; that the group, including White, agreed the victim should stay in the hotel room to "sleep it off" while the rest of the group left for the restaurant; that the victim did not awaken until about 5:30 a.m.; that when the victim awakened, she did not recall how she got to the hotel or to the room; and that the victim *then* realized that she was not wearing any underwear, although she still had her dress on, that somebody had been touching and kissing her while she was in a "dream state" and that somebody had penetrated her vagina.

10

We conclude this evidence -- and the inferences that can be drawn from it (see *People v. Wader* (1993) 5 Cal.4th 610, 640) -- amply supports the finding of the jury that White knew or should have known the victim was incapable of resisting intercourse due to alcohol intoxication. But there is more.

The record also shows that when the victim awakened at about 5:30 a.m., White *pretended* to be asleep as he lay next to the victim with his pants down. This evidence, along with the evidence from the clinical examination that showed abrasions on the victim's peri-hymenal area and lacerations on her posterior fourchette and fossa navcularis that were consistent with penetration without sexual arousal, further supports the jury's finding that the victim did not consent to, and was incapable of resisting, sexual intercourse with White.

That much of this same evidence could also support one or more different findings, including that the victim allegedly consented to sexual intercourse with White while she was in a "dream state," as White contended, does not as a matter of law change our conclusion in this case. White made this contention, and aggressively argued it, at trial. As the fact finder, the jury was entitled to accept White's version of events; however by the same logic, the jury also was entitled to reject it, as clearly turned out to be the case here. (See *People v. Smith* (2005) 37 Cal.4th 733, 739 [a court of review is bound to accept the factual and credibility determinations of the trier of fact]; see also *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [" 'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the . . .

11

jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.' "].)

As a court of review, we are not at liberty to make findings different from those made by the jury if, as in the instant case, those findings are supported by substantial evidence. (See *People v. Ochoa*, *supra*, 6 Cal.4th at p. 1206 [if the verdict or a finding is supported by substantial evidence, we must accord due deference to the trier of fact].) Moreover, White does not contend any of the witnesses' testimony was physically impossible or inherently improbable. (See *People v. Ennis* (2010) 190 Cal.App.4th 721, 725 [a court of review must accept the testimony believed by the jury unless it was physically impossible or inherently improbable, meaning "that the challenged evidence is 'unbelievable per se' . . . . [Citation.]"].)

For similar reasons, we also reject White's contention that there is a lack of evidence to support the finding that White knew or should have known that the victim was unable to resist sexual intercourse with him because she was unconscious. We conclude there is substantial evidence in the record, as summarized *ante*, also supporting this finding.

### *B.  Consideration of Convictions on Counts 1 and 2*

As noted *ante*, White was convicted in count 1 of rape of an intoxicated person (§ 261, subd. (a)(3)) and in count 2 of rape of an unconscious person (§ 261, subd. (a)(4)(A)). There is no dispute that both convictions under section 261 are based on a single act of intercourse.

Previously, we determined that under *Craig*, *supra*, 17 Cal.2d 453, White could not be convicted of both rape of an intoxicated person and rape of an unconscious person

12

as two separate counts based on a single act of intercourse. Put differently, we concluded that *Craig* stands for the proposition that section 261, subdivision (a) sets forth one crime. On remand from our high court, we must determine if *Gonzalez, supra*, 60 Cal.4th 533 changes our analysis of this issue.

In *Gonzalez*, the California Supreme Court held a defendant could be convicted of both oral copulation of an unconscious person and oral copulation of an intoxicated person (§ 288a, subds. (f), (i)) based on a single act. The court reaffirmed *Craig, supra*, 17 Cal.2d 453, and distinguished section 288a from section 261. (*Gonzalez*, *supra*, 60 Cal.4th at pp. 538-540.) The court noted that in *Craig* it had "concluded, based on the wording and structure of the statute, that former section 261 set forth only one offense that could be committed under several different circumstances, as described in its several subdivisions." (*Gonzalez, supra,* at p. 539.) "Section 288a is textually and structurally different from former section 261. Subdivision (a) of section 288a defines what conduct constitutes the act of oral copulation. Thereafter, subdivisions (b) through (k) define various ways the act may be criminal. Each subdivision sets forth all the elements of a crime, and each prescribes a specific punishment. Not all of these punishments are the same. That each subdivision of section 288a was drafted to be self-contained supports the view that each describes an independent offense . . . ." (*Gonzalez, supra,* at p. 539.)

We also observe that, in *Gonzalez*, *supra*, 60 Cal.4th 533, the Supreme Court declined to address the People's argument that *Craig*, *supra*, 17 Cal.2d 453 was wrongly decided. Instead, it distinguished *Craig*. (*Gonzalez*, *supra*, at p. 539.) In other words,

13

we read nothing in *Gonzalez* that leads us to question the continuing validity of *Craig* as it applies to the interpretation of section 261.

Because we read *Gonzalez* as reaffirming *Craig, supra,* 17 Cal.2d 453, at least in the context of the interpretation of the former section 261, we must determine if the version of section 261 under which White was charged is more similar to the former section 261 interpreted by the court in *Craig* or the version of section 288a[9] that the court interpreted in *Gonzalez, supra,* 60 Cal.4th 533.

---

[9]     Former section 288a in effect and applicable in *Gonzalez, supra,* 60 Cal.4th 533, provided in pertinent part:  "(a) Oral copulation is the act of copulating the mouth of one person with the sexual organ or anus of another person. [¶] (b)(1) Except as provided in Section 288, any person who participates in an act of oral copulation with another person who is under 18 years of age shall be punished by imprisonment in the state prison, or in a county jail for a period of not more than one year. [¶] (2) Except as provided in Section 288, any person over 21 years of age who participates in an act of oral copulation with another person who is under 16 years of age is guilty of a felony. [¶] (c)(1) Any person who participates in an act of oral copulation with another person who is under 14 years of age and more than 10 years younger than he or she shall be punished by imprisonment in the state prison for three, six, or eight years. [¶] (2) Any person who commits an act of oral copulation when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person shall be punished by imprisonment in the state prison for three, six, or eight years. [¶] (3) Any person who commits an act of oral copulation where the act is accomplished against the victim's will by threatening to retaliate in the future against the victim or any other person, and there is a reasonable possibility that the perpetrator will execute the threat, shall be punished by imprisonment in the state prison for three, six, or eight years. [¶] (d) Any person who, while voluntarily acting in concert with another person, either personally or by aiding and abetting that other person, commits an act of oral copulation (1) when the act is accomplished against the victim's will by means of force or fear of immediate and unlawful bodily injury on the victim or another person, or (2) where the act is accomplished against the victim's will by threatening to retaliate in the future against the victim or any other person, and there is a reasonable possibility that the perpetrator will execute the threat, or (3) where the victim is at the time incapable, because of a mental disorder or developmental or physical disability, of giving legal consent, and this is known or reasonably should be known to the person committing the

14

Section 261 in effect at the time White was charged provided in pertinent part:

"(a) Rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator, under any of the following circumstances: [¶] . . . [¶] (3) Where a person is prevented from resisting by any intoxicating or anesthetic substance, or any controlled

act, shall be punished by imprisonment in the state prison for five, seven, or nine years. . . . [¶] (e) Any person who participates in an act of oral copulation while confined in any state prison, as defined in Section 4504 or in any local detention facility as defined in Section 6031.4, shall be punished by imprisonment in the state prison, or in a county jail for a period of not more than one year. [¶] (f) Any person who commits an act of oral copulation, and the victim is at the time unconscious of the nature of the act and this is known to the person committing the act, shall be punished by imprisonment in the state prison for a period of three, six, or eight years. . . . [¶] . . . [¶] (g) Except as provided in subdivision (h), any person who commits an act of oral copulation, and the victim is at the time incapable, because of a mental disorder or developmental or physical disability, of giving legal consent, and this is known or reasonably should be known to the person committing the act, shall be punished by imprisonment in the state prison, for three, six, or eight years. . . . [¶] (h) Any person who commits an act of oral copulation, and the victim is at the time incapable, because of a mental disorder or developmental or physical disability, of giving legal consent, and this is known or reasonably should be known to the person committing the act, and both the defendant and the victim are at the time confined in a state hospital for the care and treatment of the mentally disordered or in any other public or private facility for the care and treatment of the mentally disordered approved by a county mental health director, shall be punished by imprisonment in the state prison, or in a county jail for a period of not more than one year. . . . [¶] (i) Any person who commits an act of oral copulation, where the victim is prevented from resisting by any intoxicating or anesthetic substance, or any controlled substance, and this condition was known, or reasonably should have been known by the accused, shall be punished by imprisonment in the state prison for a period of three, six, or eight years. [¶] (j) Any person who commits an act of oral copulation, where the victim submits under the belief that the person committing the act is the victim's spouse, and this belief is induced by any artifice, pretense, or concealment practiced by the accused, with intent to induce the belief, shall be punished by imprisonment in the state prison for a period of three, six, or eight years. [¶] (k) Any person who commits an act of oral copulation, where the act is accomplished against the victim's will by threatening to use the authority of a public official to incarcerate, arrest, or deport the victim or another, and the victim has a reasonable belief that the perpetrator is a public official, shall be punished by imprisonment in the state prison for a period of three, six, or eight years."

substance, and this condition was known, or reasonably should have been known by the accused. [¶] (4) Where a person is at the time unconscious of the nature of the act, and this is known to the accused. . . ."  (§ 261 [effective Jan. 1, 2003 to Sept. 8, 2013].)[10]

In reviewing the applicable section 261, it is clear it shares more in common with the former section 261 than section 288a interpreted in *Gonzalez, supra,* 60 Cal.4th 533. Section 261 remains textually and structurally different from section 288a.  Like the former section 261, the applicable section 261 sets forth only one offense that can be committed under several different circumstances, as described in its several subdivisions. Stated differently, the primary elements of rape, under the applicable section 261, remain the same as the former section 261:  (1) an act of sexual intercourse (2) with a person not the spouse of the perpetrator (3) without the consent of the victim.  The various subdivisions of the applicable section 261 (subd. (a)(1)-(7)) merely describe the ways in which lack of consent can be shown.  Unlike the subdivisions of section 288a, these subdivisions under section 261, subdivision (a) do not contain all the elements of a crime. (See *Gonzalez*, *supra*, at p. 539.)  They are not self-contained.  (*Ibid*.)  To the contrary, subdivisions 1 through 7 of the applicable section 261 only make sense within the context

_____

10      For clarity, we refer to the section 261 that the Supreme Court interpreted in *Craig*, *supra*, 17 Cal.2d 453 as "former section 261."  We refer to the version of section 261 under which White was charged as the "applicable section 261."  We note that the current version of section 261 has been effective since September 9, 2013.  The current section 261 is not structurally different than the applicable section. Textually, the only change of note from the applicable statute to the current statute was to subdivision (5) of section 261, rape by artifice, pretense, or concealment, where the crime was expanded from the victim submitting under the belief that the person committing the act was the victim's spouse to the belief that the person was "someone known to the victim other than the accused."

of subdivision (a). Read by themselves, subdivisions 1 through 7 describe a lack of consent. For example, the two subdivisions at issue here describe lack of consent as follows: "(3) Where a person is prevented from resisting by any intoxicating or anesthetic substance, or any controlled substance, and this condition was known, or reasonably should have been known by the accused. [¶] (4) Where a person is at the time unconscious of the nature of the act, and this is known to the accused. . . ." (§ 261 [effective Jan. 1, 2003 to Sept. 8, 2013].) These subdivisions do not mention rape or intercourse. Instead, subdivision (3) refers to being unable to resist some act, but does describe that act. A reader will only understand subdivision (3) after reading subdivision (a). It does not set forth all the elements of the crime. Likewise, subdivision (4) refers generally to the "act." This "act," however, is defined in subdivision (a). Again, the two subdivisions at issue do not contain all the elements of the crime. In fact, they do not mention intercourse or rape whatsoever. This is markedly different than the subdivisions of section 288a as interpreted by our Supreme Court in *Gonzalez*, *supra*, 60 Cal.4th at p. 539.)

In addition, the punishment for rape is set forth in a separate section of the Penal Code, which specifies that all forms of rape have the same punishment except for rape involving a minor. (See § 264, subds. (a), (c)(1) & (2).) In contrast, section 288a sets out a specific punishment under each subdivision that describes a certain type of oral copulation. (See *Gonzalez*, *supra*, 60 Cal.4th at p. 539.)

Simply put, section 261 as it applied to White is closer to the text of former section 261 that our high court interpreted in *Craig*, *supra*, 17 Cal.2d 453 than the version

17

of section 288a the court interpreted in *Gonzalez, supra*, 60 Cal.4th 533. The People, however, argue here the applicable version of section 261 was significantly changed to bring that statute under the holding of *Gonzalez*. We disagree.

The statute interpreted by the Supreme Court in *Craig* defined rape as "an act of sexual intercourse, accomplished with a female not the wife of the perpetrator, under either of the following circumstances . . . ." (*Craig, supra*, 17 Cal.2d at p. 455.) That statute continued to list six different ways rape could be committed. (*Ibid*.) The version of the statute at issue here defines rape as "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator, under any of the following circumstances . . . ." (§ 261 [effective Jan. 1, 2003 to Sept. 8, 2013].) The People place great emphasis on the deletion of the word "either" and addition of the word "any." They claim that "any," as used in the statute, connotes "one or some, regardless of . . . quantity" or an "indeterminate number." They also note that the word "either" is defined as "the one or the other." Thus, the People maintain that the word "either" limited the statute and made clear that the subdivisions of section 261 merely described the various ways rape could be committed. But by replacing "either" with "any," the statute described multiple, separate crimes. In other words, the addition of the term "any" shows that the Legislature had changed section 261 to provide a different crime for each subdivision that was violated. We are not persuaded.

We view the change of the word "either" to the term "any" to be nothing more than correction of a poor grammatical choice in drafting the older version of the statute. We agree that the word "either" indicates that there will be a choice between two options.

18

However, the former section 261 that contained the word "either" provided six different options. As such, the word "either" was not grammatically correct in that context as the statute did not present two options, but six. Therefore, the replacement of the word "either" with the word "any" simply renders the statute grammatically correct. We are not persuaded by the People's leap of logic that the word "any" somehow transforms the statute. Even by replacing the word "either" with "any," the subdivisions of the applicable version of section 261 do not set forth all the elements of the crime of rape, unlike the subdivisions of section 288a as interpreted in *Gonzalez, supra*, 60 Cal.4th at page 539. Moreover, there is nothing in the court's reasoning in *Craig, supra,* 17 Cal.2d 453 that supports the People's position.

In *Craig, supra,* 17 Cal.2d at page 455, the defendant was convicted of both rape by force and violence and statutory rape, and was sentenced to concurrent terms on both convictions. The issue before our high court was "the propriety of entering separate judgments and sentences for both forcible and statutory rape, charged under separate counts, when but a single act of sexual intercourse has been committed." (*Ibid.*) The court in *Craig* observed: "There has been a violation of but one statute -- section 261 of the Penal Code. And, while the proof necessarily varies with respect to the several subdivisions of that section under which the charge may be brought, the sole punishable offense under any and all of them is the unlawful intercourse with the victim." (*Craig, supra,* at p. 458.)

On this basis, the court in *Craig* concluded, "[O]nly one punishable offense of rape results from a single act of intercourse, though it may be chargeable in separate counts

when accomplished under the varying circumstances specified in the subdivisions of section 261 of the Penal Code." (*Craig, supra,* 17 Cal.2d at p. 458.) The court modified the judgment to state that the defendant had been "found guilty of the crime of Rape, a felony, as defined and proscribed in subdivisions 1 and 3 of section 261 of the Penal Code, and as charged in counts 1 and 2 of the amended information, being separate statements of the same offense . . . ." (*Craig, supra,* at p. 459.)

It appears the court in *Craig* treated the issue before it as one involving included offenses, as noted by the following language: "The authorities have set down certain rules or tests whereby it may generally be determined whether one or more offenses result from a single act or transaction. Frequently, the test is stated to be 'the *identity of the offenses* as distinguished from the identity of the transactions from which they arise. A defendant may be convicted of two separate offenses arising out of the same transaction when each offense is stated in a separate count and when the two offenses differ in their necessary elements and one is not included *within the other*.' " (*Craig, supra,* 17 Cal.2d at p. 457.) The rule permitting multiple convictions for a single act is based on section 954, which states that " '[a]n accusatory pleading may charge . . . different statements of the same offense' " and " 'the defendant may be convicted of any number of the offenses charged.' " (See *People v. Ortega* (1998) 19 Cal.4th 686, 692.) The rule has been applied repeatedly by our Supreme Court in a variety of contexts in which defendants have asserted that their convictions fall within the exception for lesser included offenses. (See e.g., *People v. Reed* (2006) 38 Cal.4th 1224, 1227 [single act of possessing firearm supports multiple firearm convictions]; *Ortega, supra,* at p. 693 [single act supports

20

grand theft and carjacking convictions]; *People v. Pearson* (1986) 42 Cal.3d 351, 354-355 [single act supports rape and lewd conduct convictions].) In those cases the court upheld multiple convictions because each crime had a distinct element not required of the other and neither crime was the lesser included offense of the other.

The People argue that, in *Gonzalez*, *supra*, 60 Cal.4th 533, the Supreme Court limited *Craig* to its facts. The Supreme Court did discuss the holding of *Craig*: "*Craig* did not hold that a single Penal Code section could never comprise multiple offenses; it simply concluded, based on the wording and structure of the statute, that former section 261 set forth only one offense that could be committed under several different circumstances, as described in its several subdivisions. This conclusion flowed naturally from the wording and structure of former section 261. Indeed, the court in *Craig* acknowledged that ' "[a] defendant may be convicted of two separate offenses arising out of the same transaction when each offense is stated in a separate count and when the two offenses differ in their necessary elements and one is not included within the other." ' (*Craig*, *supra*, 17 Cal.2d at p. 457.)" (*Gonzalez*, *supra*, 60 Cal.4th at p. 539.) Even considering the Supreme Court's discussion of the scope of the holding in *Craig*, it remains a case of statutory construction of the former rape statute. Further, our high court has reiterated in various contexts that "[t]he subdivisions of section 261 do not state different offenses but merely define the different circumstances under which an act of intercourse constitutes the crime of rape." (*People v. Collins* (1960) 54 Cal.2d 57, 59; see *People v. Maury* (2003) 30 Cal.4th 342, 427 ["[R]ape by means of violence is not a different offense from rape by means of force or fear; these terms merely describe

21

different circumstances under which an act of intercourse may constitute the crime of rape."]; italics omitted.)

Further, at least one other recent case has followed *Craig, supra,* 17 Cal.2d 453. In a situation identical to the case at bar, the Court of Appeal reached the same conclusion. In *People v. Smith* (2010) 191 Cal.App.4th 199, the defendant was convicted of two counts of rape -- rape of an intoxicated woman, and rape of an unconscious woman. The evidence demonstrated only one act of sexual intercourse. (*Id.* at p. 205.) Following *Craig,* the court in *Smith* concluded that the defendant could stand convicted of only a single count of rape based on the single act of intercourse. (*Smith, supra,* at p. 205.)

During oral argument, the People made the rather remarkable argument that we should further limit or otherwise distinguish *Craig*, *supra*, 17 Cal.2d 453. They contend the Supreme Court was telling us to do so in *Gonzalez*, *supra*, 60 Cal.4th 533. Nevertheless, the People were unable to point to any portion of the opinion in *Gonzalez* to support their position. Unlike the People, we do not read *Gonzalez* as a plea from the Supreme Court to ignore *Craig*, especially when our high court explicitly declined to overrule *Craig* as urged by the People in *Gonzalez.* (See *Gonzalez*, *supra*, at p. 538.) Further, we observe the Supreme Court again refrained from overruling *Craig* when it granted review of this matter. Instead of addressing *Craig*, the Supreme Court remanded this matter to us to reconsider in light of *Gonzalez.* Thus, our high court has recently declined to overrule *Craig* on two occasions. We doubt very much that the Supreme Court needs our help to determine if *Craig* should be overruled. It very well may be that the Supreme Court will determine that *Craig* is no longer good law and should be overruled. Until it does so,

22

however, we must follow *Craig*. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

We also are not persuaded by the People's argument that section 954 authorizes multiple convictions, subject to section 654's limitations on multiple punishments. As we have noted, section 954 allows pleading of multiple offenses, *including separate statements of the same offense*. We think the People's analysis is flawed at its starting point. The People approach this issue from the premise that section 261, subdivisions (a)(3) and (a)(4) are separate offenses. That major premise in wrong.

As the court noted in *Craig, supra,* 17 Cal.2d 453, section 261 creates a single crime of rape. Although the section has been amended a number of times since *Craig*, the statute still defines a single crime. Section 261, subdivision (a)(3) involving an intoxicated victim and subdivision (a)(4) involving an unconscious victim are simply separate ways in which the crime of rape can be committed under section 261. Section 261, subdivisions (a)(3) and (a)(4) do not define separate crimes and do not contain separate punishments. Rather, section 264 provides the punishment for rape under section 261, without reference to the various subdivisions, which establish the circumstances in which sexual intercourse can be proved to be rape.[11]

The People's reliance on case law that allows conviction of multiple offenses from a single act, subject to section 654 limitations is misplaced. Those cases address different

_____

[11]     Section 264 does provide for increased punishment for forcible rape (§ 261, subd. (a)(2)) where the victim is a minor, a matter not relevant to this case.

offenses, with different elements. The analysis of multiple offenses arising from the same act is not relevant to a case such as this where the statute at issue only defines one crime, regardless of the manner of its commission. In the case of truly separate offenses arising from a single act, multiple convictions are permitted, even if multiple punishments are not.

In the present case, as we have discussed, only one crime exists, based upon a single act, and that is rape as defined in the applicable section 261. The prosecution properly pled two counts of rape as *separate statements of the same offense*, but because the counts are in fact separate statements of only one offense, *Craig, supra,* 17 Cal.2d 453 holds there may only be one conviction for the single act. (*Smith, supra*, 191 Cal.App.4th at p. 205.)[12]

In summary, this case is controlled by *Craig, supra,* 17 Cal.2d 453, which requires that we strike one of the rape counts, leaving a single conviction for the single act. (See *Smith, supra,* 191 Cal.App.4th at p. 205.) We therefore will modify the judgment to strike the second rape count.

### C. Mistake of Fact

White next contends the trial court prejudicially erred when it refused to instruct the jury on mistake of fact, CALCRIM No. 3406, in connection with count 2 for rape of an

---

[12] Similarly, in *People v. Ryan* (2006) 138 Cal.App.4th 360, 368, the court held the defendant could only be convicted of one count where the person had been charged with forgery by signing a false name and forgery by presenting a forged check. In *People v. Muhammed* (2007) 157 Cal.App.4th 484, 492-494, the court found a single stalking offense where the defendant had been charged with and convicted of four counts of stalking. On appeal the court vacated three of the four convictions.

24

unconscious person.[13]  Specifically, he contends that because a key issue in this case was his mistaken belief regarding whether the victim consented to sexual intercourse, the trial court erred when it refused to give CALCRIM No. 3406.  We reject this contention for two reasons.

First, the trial court had no duty to instruct on mistake of fact because that defense is not available to a charge of rape of an unconscious person.  (See *People v. Dancy* (2002) 102 Cal.App.4th 21, 34-35.)

Second, we note the jury found against White on the issue of whether he knew or reasonably should have known the victim was unable to resist sexual intercourse because the victim was unconscious.  This finding also went to the issue of consent:  if the jury believed that White did not actually know, or that a reasonable person would not have known, the victim was unable to resist the act of sexual intercourse because, for example, the victim consented to sex, as White aggressively argued at trial, then it would have acquitted him of rape.  Thus, the issue of White's intent and the victim's consent was already before the jury and therefore, we conclude under any standard of review that any potential error in failing to instruct the jury with CALCRIM No. 3406 was harmless.

---

[13]    CALCRIM No. 3406 provides:  "The defendant is not guilty of *<insert crime[s]>* if (he/she) did not have the intent or mental state required to commit the crime because (he/she) [reasonably] did not know a fact or [reasonably and] mistakenly believed a fact. [¶] If the defendant's conduct would have been lawful under the facts as (he/she) [reasonably] believed them to be, (he/she) did not commit *<insert crime[s]>*. [¶] If you find that the defendant believed that *<insert alleged mistaken facts>* [and if you find that belief was reasonable], (he/she) did not have the specific intent or mental state required for *<insert crime[s]>*. [¶]  If you have a reasonable doubt about whether the defendant had the specific intent or mental state required for *<insert crime[s]>*, you must find (him/her) not guilty of (that crime/those crimes)."

25

(See *People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18, 24.)

### D.  Juror Misconduct

White next contends the trial court erred when it denied his new trial motion based on juror misconduct.

### 1.  Brief Additional Background

After the prosecution's case-in-chief, but before the defense put on its case, Juror No. 12 wrote the following note to the court:

"[The victim], perhaps the most experienced drinker in the group, yet she's incapacitated at hotel and the next day.  [¶]  Defendant went in cab with only [the victim], without cell phone, essentially ditched the group, and could have been alone with [the victim] in hotel room except for accidental meeting [with the rest of the group].  [¶]  What's the clearance time of a date rape drug from the system?  Was the drug test in April [on the victim] to pick up the presence of drug in urine sample?"

After advising counsel, the prosecutor suggested the court reread the stipulation of the parties regarding the victim's negative drug test and re-admonish the jury that it should only consider the evidence presented.  Defense counsel also recommended the court admonish the jury that it was merely at the listening stage of the trial.

When the trial resumed, the court reread the stipulation about the negative drug test and both counsel reiterated their agreement to that stipulation.  The court then advised the jury as follows:  "The other issues that were of concern in the juror note to me, which is

26

court exhibit number 5, those are matters to be addressed in deliberations, those concerns."

After the verdict, the defense moved for a new trial based on the alleged misconduct of Juror No. 10. Specifically, after the verdict Juror No. 5 notified the court and ultimately testified that Juror No. 10, *following the verdicts* but before oral pronouncement of the verdict, admitted to conducting research on the bar where the victim worked and reading a flattering comment potentially involving the victim.

The court in response questioned Juror No. 5 outside the presence of the remaining jurors. Juror No. 5 noted that Juror No. 10 did not indicate one way or the other whether that research affected Juror No. 10's judgment regarding the case, nor could Juror No. 5 recall Juror No. 10 referencing that research during jury deliberations.

The court next questioned Juror No. 10. Juror No. 10 admitted to sharing the research with the jury *after* the jury had reached a verdict, while waiting to deliver it, but told the court that research "had nothing to do with the deliberations at all. Nothing." Juror No. 10 explained, "There wasn't any reason for it. I just kind of looked up . . . the bar, and then was reading the reviews." Juror No. 10 admitted that during trial she spent a few minutes looking up the bar where the victim worked, but said "that was it." Consistent with what Juror No. 5 had told the court and counsel, Juror No. 10 told the court she read a review about a "very good looking brunette bartender" who worked at the bar, but the review did not mention the bartender by name. In response to the court's question whether the research affected her deliberations, Juror No. 10 answered, "Absolutely not."

27

Juror No. 10 further explained that when she learns of a new restaurant she looks them up "online," that her doing so was not unique to this case and after she apologized to the court and counsel, that her doing so in this case "[h]onestly . . . was the most innocent thing."

The defense subsequently filed a motion for new trial based on Juror No. 10's alleged misconduct.[14] In so doing, the defense attached reviews of the bar where the victim worked, including one that referenced the victim as being a good bartender who knew her customers' names. The defense argued Juror No. 10 was not credible concerning her motivations for looking up online the bar where the victim worked and that the compliment of the victim was inherently prejudicial.

In opposing the new trial motion, the prosecution noted the research done by Juror No. 10 was not disclosed to other jurors and was, in any event, irrelevant to the issue of guilt or innocence, particularly because there was evidence that another person with the same first name as the victim also worked at the bar. The prosecutor also noted the alleged misconduct did not compare to a juror viewing a crime scene. The trial court agreed with the prosecution and thus denied the defense's new trial motion.

---

14    The mistrial motion did not address the alleged misconduct by Juror No. 12 in connection with the jury question. Although White ostensibly forfeited this claim of alleged misconduct when he failed to object to it in the trial court (see *People v. Russell* (2010) 50 Cal.4th 1228, 1250 [noting that a claim of misconduct is forfeited "when the defendant fails to object to a juror's continued service and fails to seek a mistrial based upon prejudice"]), we nonetheless consider this issue on the merits to forestall any claim by White of ineffective assistance of counsel.

## 2. Governing Law and Analysis

Section 1181, subdivision 3, provides that the trial court may grant a new trial when "the jury has . . . 'been guilty of any misconduct by which a fair and due consideration of the case has been prevented [citation].' [¶] We first determine whether there was any juror misconduct. Only if we answer that question affirmatively do we consider whether the misconduct was prejudicial." (*People v. Collins* (2010) 49 Cal.4th 175, 242.) Juror misconduct raises a presumption of prejudice. (*People v. Page* (2008) 44 Cal.4th 1, 59.) Unless the presumption is rebutted by the prosecution, a new trial should be granted. (*Ibid.*) As noted by one court, " '[t]his does not mean that every insignificant infraction of the rules by a juror calls for a new trial. Where the misconduct is of such trifling nature that it could not in the nature of things have prevented either party from having a fair trial, the verdict should not be set aside.' " (*People v. Calles* (2012) 209 Cal.App.4th 1200, 1211.)

In determining whether juror misconduct occurred we accept the trial court's credibility findings and findings of historical facts if supported by substantial evidence. (*People v. Mendoza* (2000) 24 Cal.4th 130, 195.) Whether a verdict must be overturned for jury misconduct is resolved by employing the substantial likelihood test, which is an objective standard. (*In re Hamilton* (1999) 20 Cal.4th 273, 296; *People v. Marshall* (1990) 50 Cal.3d 907, 951.) " 'Whether prejudice arose from juror misconduct . . . is a mixed question of law and fact subject to an appellate court's independent determination.' " (*People v. Danks* (2004) 32 Cal.4th 269, 303.)

Turning first to the question posed by Juror No. 12, we conclude there was no misconduct when that juror asked the question about the "clearance time of a date rape drug." Our high court and Courts of Appeal repeatedly have held that a trial court has the discretion to allow jurors to submit questions to be asked of witnesses, as long as certain controls are in place. (See, e.g., *People v. Majors* (1998) 18 Cal.4th 385, 407; *People v. Cummings* (1993) 4 Cal.4th 1233, 1305; *People v. Anderson* (1990) 52 Cal.3d 453, 481; *People v. McAlister* (1985) 167 Cal.App.3d 633, 644; *People v. Gates* (1979) 97 Cal.App.3d Supp. 10, 13-15.) The court should not allow jurors to ask questions directly to witnesses (*McAlister*, *supra*, at pp. 644-645), and questions instead should be written down and submitted for consideration by the court and counsel outside the presence of the jury. (*Cummings*, *supra*, at p. 1305; *McAlister*, *supra*, at p. 644.) The questions, if appropriate, may then be asked by the court or by counsel. (*Majors*, *supra*, at p. 407; *Cummings*, *supra*, at p. 1305.)

Here, the record shows Juror No. 12 submitted a written question to the court. Outside the presence of the jury, the court then appropriately met with counsel to discuss the question. The record shows all agreed the best way to respond to the question was to reread the stipulation of the parties regarding the negative drug screen performed on the victim and to re-admonish the jury. The record shows the court did exactly that when it told the jury the parties had stipulated a urine sample from the victim was collected on February 16, 2010, a comprehensive drug screen was subsequently performed on that sample and the result of that screen was negative for all substances. We thus conclude there was no misconduct with respect to Juror No. 12.

30

However, Juror No. 10's conduct is another issue altogether.  The record shows that sometime between opening and closing argument, Juror No. 10 went online and looked up the bar where the victim worked.  Juror No. 10 told the court and counsel she did so for no apparent reason other than when she hears about a new place she "always" looks them up and in this instance she looked up the name of the bar where the victim worked and read a few reviews about the bar from a website.  Juror No. 10 stated that she spent only a few minutes online reading about the bar, that the reviews she read in no way affected her deliberations and that she only mentioned she had done so after the jury had completed its deliberations and reached a verdict.

The People wisely concede Juror No. 10 committed misconduct by looking up the bar online, even if for just a few minutes.  The issue thus becomes whether that misconduct, which we presume was prejudicial, is rebutted " 'by a reviewing court's determination, *upon examining the entire record*, that there is no substantial likelihood that the complaining party suffered actual harm.' "  (*People v. Thomas* (2012) 53 Cal.4th 771, 819.)

Indeed, "[w]hen juror misconduct involves the receipt of information from extraneous sources, a substantial likelihood of juror bias 'can appear in two different ways.  First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror.  [Citations.]  Second, we look to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant.  [Citation.]' [Citation.]  . . .  'In an extraneous-information case, the "entire record" logically bearing

31

on a circumstantial finding of likely bias includes the nature of the juror's conduct, the circumstances under which the information was obtained, the instructions the jury received, the nature of the evidence and issues at trial, and the strength of the evidence against the defendant.' " (*People v. Thomas*, *supra*, 53 Cal.4th at p. 819.)

We conclude from the entire record that there is no substantial likelihood that White suffered actual harm when Juror No. 10 went online for a few minutes and read a few reviews about the bar where the victim worked. The reviews about the bar were irrelevant to any of the issues in the case, to wit: whether the victim consented to sexual intercourse with White at the hotel, after the victim had become intoxicated while out with a group that included White.

That one of the reviews read by Juror No. 10 mentioned an attractive brunette that worked at the bar does not change our conclusion: the jury saw the victim for itself, heard her testimony and it decided whether to accept her version of what happened or White's.

In addition, the review read by Juror No. 10 regarding the atmosphere in the bar where the victim worked was already in evidence, as several witnesses testified it was a neighborhood bar where the bartenders remembers their customers' names and drink preferences. Thus, the extrajudicial information learned by Juror No. 10 in the few minutes she read reviews online about the bar (not from the bar's website) was information already before the jury.

Moreover, we reject White's contention that Juror No. 10's disregard of the court's instructions demonstrated actual bias against him. (See *People v. Nesler* (1997) 16

32

Cal.4th 561, 582-583 [actual bias occurs when a juror is unable to put aside his or her impressions or opinions based on extrajudicial information he or she received and render a verdict based solely on the evidence at trial].) We note from the record that the trial court, with counsel present, extensively questioned Juror No. 10 and she denied any improper motive in looking up the bar and told the court she did so out of curiosity, which is something she often did when she hears of a new restaurant or place. The court clearly found Juror No. 10 credible and believed her testimony that her actions did not in any way influence the jury's deliberations.

Thus, although Juror No. 10 engaged in misconduct, given the nature of the misconduct, the circumstances surrounding the misconduct and the issues in the case, and given the strength of the evidence against White reviewed *ante*, we independently conclude the presumption of prejudice has been rebutted because that misconduct was fleeting and was neither inherently and substantially likely to have influenced Juror No. 10 or the other members of the jury nor was Juror No. 10 actually biased against White.

*E. Denial of Probation*

Lastly, White contends the trial court abused its discretion when it sentenced him to state prison for three years and denied his request for probation.

A sentencing court enjoys broad discretion in determining whether to grant or deny probation. A defendant who is denied probation bears a heavy burden to show the trial court has abused its discretion. (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1120; *People v. Weaver* (2007) 149 Cal.App.4th 1301, 1311.) " 'In reviewing [a trial court's determination whether to grant or deny probation], it is not our function to substitute our

judgment for that of the trial court.  Our function is to determine whether the trial court's order granting [or denying] probation is arbitrary or capricious or exceeds the bounds of reason considering all the facts and circumstances.' " (*Ibid.*)

Here, the record shows that during the sentencing hearing the court fully considered the facts and circumstances of the case.  The court heard from the victim, who made a lengthy statement asking the court to sentence White to prison for the rape that the victim claimed "forever changed [her] life."  The record shows that in connection with sentencing the court also considered the sentencing statement submitted by the defense, which requested formal probation based on White's age, lack of significant criminal history and his cooperation with law enforcement for having what White called "drunk sex" with the victim; a 13-page psychological evaluation of White suggesting White was a low risk to reoffend; the probation report, which, after identifying various mitigating factors including White's lack of significant criminal history, nonetheless recommended White be sentenced to state prison for three years;  and the lengthy argument of counsel.

Although there were various factors favorable to White, which the record shows the court carefully considered and which at one point appeared to sway the court to consider granting probation, in the end the record also shows the court noted this was a presumptive prison case and it found no reason to deviate from that presumption given the seriousness of the crime and the impact of that crime on the victim.  On this record, we conclude the court's order denying White probation was not " 'arbitrary or capricious' " or " 'exceed[ed] the bounds of reason considering all the facts and circumstances' " of the case.  (*People v. Weaver*, *supra*, 149 Cal.App.4th at p. 1311.)

34

DISPOSITION

The judgment is modified to: (1) strike count 2; and (2) vacate the conviction on count 2, together with the sentence imposed but stayed on that count. The judgment is otherwise affirmed. The trial court is directed to prepare an amended abstract of judgment and minute order to reflect these modifications and forward a certified copy to the Department of Corrections and Rehabilitation.

HUFFMAN, J.

I CONCUR:

McDONALD, J.

BENKE, J., Concurring and Dissenting.

As noted by the majority, our high court in this case previously granted the People's petition for review pending the court's decision in *People v. Gonzalez* (2014) 60 Cal.4th 533 (*Gonzalez*), after a majority of this court found pursuant to *People v. Craig* (1941) 17 Cal.2d 453 (*Craig*) that defendant White allegedly could not be convicted of *both* rape of an intoxicated person (Pen. Code, § 261, subd. (a)(3); count 1) and rape of an unconscious person (Pen. Code, § 261, subd. (a)(4)(A); count 2).[1]  The majority now reaffirms its previous holding in light of, or despite, *Gonzalez*.  The majority concludes subdivisions (a)(3) and (a)(4)(A) of applicable section 261 "do not define separate crimes and do not contain separate punishments," but rather "are simply separate ways in which the crime of rape can be committed under section 261."  (Maj. opn. *ante*, at p. 23.) I dissent to part B of the majority's opinion, which holds that counts 1 and 2 must be consolidated.  First, based on *Gonzalez* and its discussion of *Blockburger v. United States* (1932) 284 U.S. 299, 304 (*Blockburger*), and based on *Craig* itself, I conclude that subdivisions (a)(3) and (a)(4)(A) of applicable section 261 require proof of different elements (i.e., the "elements test"), and, therefore, each subdivision constitutes an individual rape offense for which defendant may be separately charged and convicted. With respect to the actual holding of *Craig* (i.e., that rape and statutory rape constitute a "single outrage" to be sentenced as one crime), I conclude it was based on then-existing

---

[1]     For clarity, I will use the same nomenclature as the majority (maj. opn. *ante*, at p. 16, fn. 3) in referring to the versions of section 261 of the Penal Code at issue in this case. "Former section 261" will refer to the version interpreted by the high court in 1941 in *Craig*, and "applicable section 261" will refer to the version under which defendant was charged.  In addition, all further statutory references are to the Penal Code.

cultural views of rape, which have since been abandoned, and that, in any event, the narrow holding of *Craig* was superseded when, among other actions, the Legislature adopted section 261.5. That statute set forth the separate crime of statutory rape, with a separate sentencing scheme. (Stats. 1970, ch. 1301, § 2.)

Finally, I conclude *Craig*'s consolidation of two counts into a single conviction is explained by concerns with regard to the then-existing sentencing system, and, in any event, the disposition in *Craig* has, for sound reasons, been abandoned by case law culminating with *In re Wright* (1967) 65 Cal.2d 650 (*Wright*), which interprets section 654 as requiring application of a stay where a defendant has been convicted of multiple crimes arising from the same act.

In summary, because *Craig* was bound by cultural views and sentencing concerns that no longer exist, I conclude the modern and primary importance of *Craig* is its clear support for use of the elements test. Therefore, I would affirm White's conviction on count 2 for violation of applicable section 261, subdivision (a)(4)(A) and, like the trial court, would apply section 654, subdivision (a) to stay sentence on that offense.

A. *Because each count requires proof of at least one different element, defendant was properly convicted on counts 1 and 2.*

Our high court in *Gonzalez* considered a question similar to the one presented in the instant case, namely, "whether a defendant may, consistently with . . . section 954, be convicted of both oral copulation of an unconscious person (§ 288a, subd. (f)) and oral copulation of an intoxicated person (*id.*, subd. (i)) based on the same act." (*Gonzalez*, *supra*, 60 Cal.4th at p. 535, fn. omitted.) As noted, a majority of our court had used

2

*Craig* to preclude multiple convictions under former section 288a.[2]  (*Ibid.*)

In reversing, the court in *Gonzalez* did not disapprove of *Craig*, but neither did it approve of *Craig* in the manner suggested by the majority.  Notably, *Gonzalez* points out that *Craig* "acknowledged that '"[a] defendant may be convicted of two separate offenses arising out of the same transaction when each offense is stated in a separate count and when the two offenses differ in their necessary elements and one is not included *within the other*."'"  (*Gonzalez*, *supra*, 60 Cal.4th at p. 539, quoting *Craig*, *supra*, 17 Cal.2d at p. 457.)  Although the court in *Gonzalez* examined the structure of section 288a and noted that each subdivision was drafted to be self-contained by prescribing a specific punishment, the court also noted this fact "*supports* the view that each describes an independent offense, and therefore section 954 is no impediment to a defendant's conviction under more than one such subdivision for a single act."  (*Gonzalez*, at p. 539, italics added.)  It is clear to me that, although *Gonzalez* uses the separate punishments of section 288a as *support* for its conclusion there are multiple offenses in the subdivisions of section 288a, it did not by this statement create a *requirement* that a separate punishment must be prescribed in each subdivision in order to charge and convict a defendant of multiple subdivisions that already require different elements.  Holding, as my colleagues do, that *Gonzalez* imposes an additional requirement of separate punishment for each such subdivision creates an inconsistency in *Gonzalez* that is not

---

2      Section 288a was amended effective September 9, 2013.  (Stats. 2013, ch. 282, § 1.)  The amendment did not alter subdivisions (f) or (i) under which the defendant in *Gonzalez* was charged and convicted.  For clarity, I will refer to the version of section 288a under which the defendant in *Gonzalez* was convicted as "former section 288a."

3

there and marginalizes or perhaps eliminates altogether the elements test that is clearly set forth in that case and in *Craig*.

In concluding *Gonzalez* applies an elements test rather than what I will call a "structure test," I find it significant that *Gonzalez*'s analysis rests in large part on *Blockburger*, *supra*, 284 U.S. 299. (*Gonzalez*, *supra*, 60 Cal.4th at p. 539, citing *Blockburger*, *supra*, 284 U.S. at p. 304.) Briefly, in *Blockburger*, the defendant was charged and convicted in count 3 with selling eight grains of morphine "not in or from the original stamped package" and in count 5 with the sale (as charged in count 3) of that drug not made pursuant to a "written order of the purchaser," as was required. (*Blockburger*, at p. 301.) The defendant there argued there was but one sale to the same purchaser, and, therefore, he committed only one offense for purposes of counts 3 and 5. (*Id.* at p. 304.)

In rejecting this argument, *Blockburger* states: "The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether *each provision requires proof of a fact which the other does not.*" (*Blockburger*, *supra*, 284 U.S. at p. 304, italics added; see *Gonzalez*, *supra*, 60 Cal.4th at p. 539, quoting this language in *Blockburger*.) As a result, the United States Supreme Court concluded there were two offenses, despite the fact counts 3 and 5 involved only one sale of morphine. (*Blockburger*, at p. 304.)

I note, there is no mention in *Blockburger* of any requirement there must be separate punishments, in addition to separate elements, in determining whether the same act or transaction gives rise to independent offenses when multiple statutory provisions of a criminal statute are violated. All that is required for separate charging and conviction is

4

that the elements are different and one subdivision is not necessarily included within the other.

The majority, in my view, completely disregards the elements test required by established law and instead relies exclusively on a "structure test" in concluding that applicable section 261 more closely resembles former section 261 than former section 288a. In particular, the majority states that applicable section 261 sets forth only one offense of rape, which is "(1) an act of sexual intercourse (2) with a person not the spouse of the perpetrator (3) without the consent of the victim." (Maj. opn. *ante*, at p. 16.) According to the majority, the various provisions (i.e., (1)-(7)) following subdivision (a) of applicable section 261 "merely describe the ways in which lack of consent can be shown" for purposes of rape. (Maj. opn. *ante*, at p. 16.) Relying on the structure of the statute, the majority notes that a reader can only understand subdivision (3) or (4) of applicable section 261 by reading subdivision (a) of that statute, which, according to the majority, makes former section 288a "markedly different" than applicable section 261. (Maj. opn. *ante*, at p. 17.)

I find no help in this comparison because I note that subdivision (a) of former section 288a is the only subdivision within that statute to define what "oral copulation" means: "Oral copulation is the act of copulating the mouth of one person with the sexual organ or anus of another person." (Former § 288a, subd. (a).) Subdivisions (b) through (k) of former section 288a then rely on that definition to define the various circumstances under which the crime of oral copulation can be committed. This is not unlike subdivisions (1) through (7) of subdivision (a) of applicable section 261, which must be read and considered in connection with subdivision (a), defining rape.

5

Nor do I find persuasive the case law relied upon by the majority.

In support of its holding, the majority relies on *People v. Smith* (2010) 191 Cal.App.4th 199 (*Smith*). Briefly, much like White here, the defendant in *Smith* was convicted of rape of an intoxicated person and rape of an unconscious person. (*Id.* at p. 201.) Relying on *Craig*, the *Smith* court summarily concluded both of the defendant's convictions could not stand "because 'only one punishable offense of rape results from a single act of intercourse, though it may be chargeable in separate counts when accomplished under the varying circumstances specified in the subdivisions of [former] section 261 of the Penal Code.'" (*Smith*, at p. 205, quoting *Craig*, *supra*, 17 Cal.2d at p. 458.)

Unlike the majority, I do not find *Smith* helpful. The case lacks any analysis on our issue and instead, in several sentences, merely quotes *Craig* for the rule it applied. Moreover, it is important to note that *Smith* modified the judgment to *strike*, as opposed to *consolidate*, the rape counts. Thus, the majority's apparent agreement with the disposition allowed in *Smith* would leave a sentencing court with multiple options, including consolidation of counts, as occurred here, or striking of counts, as occurred in *Smith*.

As I discuss in more depth *post*, this resulting state of confusion and inconsistency of sentences is one of the main reasons why I believe our Supreme Court abandoned use of the dispositions applied here and in *Smith*. Instead, the court has for decades required application of section 654, subdivision (a) when a defendant stands convicted of multiple offenses arising out of the same act.

The majority also relies on *People v. Maury* (2003) 30 Cal.4th 342 (*Maury*) and *People v. Collins* (1960) 54 Cal.2d 57 (*Collins*) to support its conclusion that violation of multiple

6

subdivisions of subdivision (a) of applicable section 261 by the same act or transaction involves only one offense. (Maj. opn. *ante*, at p. 22.) As relevant to my discussion, the issue in *Maury* was whether a defendant's due process rights were violated when he was charged with rape "'by means of force and fear of immediate and unlawful bodily injury,'" and when the jury was instructed the defendant could be guilty of rape if he accomplished the sexual intercourse with the victim "'by means of force, *violence*, or fear of immediate and unlawful bodily injury.'" (*Maury*, at p. 427, italics added.) In rejecting this argument, the *Maury* court cited *Collins* for the proposition that "rape by means of violence is *not* a different offense from rape by means of force or fear," but rather were terms that "merely describe[d] different circumstances under which an act of intercourse may constitute the crime of rape." (*Maury*, at p. 427.)

*Maury*, however, offers no support for the proposition that the various subdivisions in applicable section 261 comprise merely one offense of rape because I note that "force," "violence" or "fear of immediate and unlawful bodily injury" all appear under the *same* subdivision—(a)(2)—of applicable section 261. Likewise, the holding in *Collins*—affirming a conviction of statutory rape under an information charging a defendant with forcible rape—has been abrogated as a result of "legislative recasting" of former section 261. (*Gonzalez*, *supra*, 60 Cal.4th at p. 540; see *People v. Chapman* (1975) 47 Cal.App.3d 597, 604, fn. 3.) Neither *Maury* nor *Collins* supports a continued *Craig*-type analysis used by the majority in circumstances such as those presented in the instant case. Finally, the majority opinion leads to the conclusion that the Legislature intended to treat the sex crimes of rape and oral copulation differently, such that a defendant who commits oral copulation of an intoxicated and unconscious person can be guilty of two offenses,

7

whereas a defendant who commits rape of an intoxicated and unconscious person can be guilty of only one offense. I do not agree that the Legislature intended such a result. Applying the elements test consistently to both statutes prevents this disparity. Because we can assume the Legislature was aware of this test and its settled application in the law, we need not challenge the Legislature to make itself more clear on this point or solve a problem that does not exist.

Applying the elements test here, I conclude that White committed two separate offenses when he was found guilty in counts 1 and 2 of rape of an intoxicated person and rape of unconscious person, respectively, as clearly each count required proof of a different element and each defined a different way in which the act of rape was committed.[3] I find the majority's abandonment of the elements test and exclusive reliance on a "structure test" not only confusing and likely to cause mischief,[4] but also contrary to *Gonzalez.*

---

[3]    Under applicable section 261, subdivision (a)(3), the crime of rape occurs "[w]here a person is prevented from resisting [the act of sexual intercourse accomplished with a person not the spouse of the perpetrator] by any intoxicating or anesthetic substance, or any controlled substance, and this condition was known, or reasonably should have been known by the accused." (§ 261, subd. (a)(3).)  However, under subdivision (a)(4) of applicable section 261, the crime of rape occurs "[w]here a person is at the time unconscious of the nature of the act, and this is known to the accused.  As used in this paragraph, 'unconscious of the nature of the act' means incapable of resisting [the act of sexual intercourse accomplished with a person not the spouse of the perpetrator] because the victim meets any one of the following conditions: [¶] (A) Was unconscious or asleep." (§ 261, subd. (a)(4).)  Clearly, subdivisions (a)(3) and (a)(4)(A) are comprised of different elements, which supports the conclusion they are independent offenses.

[4]    I note our high court recently granted the People's petition for review in *People v. Vidana*, review granted April 1, 2015, S224546, which involved the issue of whether larceny and embezzlement were separate and distinct offenses under *Gonzalez.*

B. *Penal Code section 654 and the post-Craig jurisprudential development of that statute govern this case.*

As indicated, I believe that *Gonzalez*, *Blockburger*, and *Craig* require use of the elements test; that defendant was properly charged and convicted of separate subdivisions of applicable section 261, subdivision (a); and that section 654 was thereafter properly applied. This should end the analysis. However, the ending is not so simple because we must deal with *Craig*'s consolidation of two counts into one. My colleagues view this disposition in *Craig* as support for their conclusion that *Craig* requires there be a conviction of only one count of rape in this case.

In my view, *Craig* is a case with a particularly complex identity. I would not conclude it has been overruled nor would I agree it should be overruled. However, I do believe it was compelled to rest on a culture that no longer exists, and the serious problem of multiple punishment it then faced has long since been resolved. I am left with the conclusion, discussed *ante* in section A, that *Craig*'s significance is its application of the elements test.

1. The culture and law regarding the crime of rape at the time of *Craig*

At the time of *Craig*, the then-prevailing view of rape was that of a single form of "outrage" to the person and feelings of the victim, and, as such, a victim could not be

Similarly, the Court of Appeal just granted rehearing on our exact issue in *People v. Soria*. (*People v. Soria* (C070238, rehg. granted Mar. 16, 2015).) In addition, Division Three of our court recently decided *People v. Wilson* (2015) 234 Cal.App.4th 193, 199 by relying in part on *Gonzalez* and *Craig*, when it found the Legislature did not intend to create two different crimes within the meaning of section 422 (i.e., making a criminal threat). In my view, these cases as well as others recently decided show the difficulty of applying a *Craig*-type analysis, as that case is interpreted by the majority, in circumstances such as those presented in the instant case.

"doubly outraged, once by force and once because of her tender years, but suffered only a single offense." (*People v. Mummert* (1943) 57 Cal.App.2d 849, 856–857, overruled in *Collins*, *supra*, 54 Cal.2d at p. 60.) Society's evolving view of rape teaches that in enacting separate subdivisions in applicable section 261, each with its own elements, the Legislature has recognized each subdivision as a separate and distinct "outrage" and, thus, offense.

Moreover, in finding that former section 261 defined but one crime, the court in *Craig* relied on the express language of the former statute, which stated that rape occurred "under *either* of the following circumstances." (Former § 261, italics added.) The term "either" connotes the choice between "one or the other." (Random House Unabridged Dict. (2d ed. 1993) p. 625.) The "either of" language in the former statute certainly lent the statute to the interpretation adopted in *Craig*.

However, the "either of" language is no longer in subdivision (a) of section 261— it was replaced with the word "any"—and rape may now be accomplished by any of the enumerated acts. The term "any" connotes "one or more." (Random House Unabridged Dict., *supra*, at p. 96.) Significantly, this change was made by the same bill that extended the protection of our rape statute, for the first time, to men. (Stats. 1979, ch. 994, § 1, p. 3383.) I believe these changes, coupled with the Legislature's earlier separation of statutory rape from the main rape statute, should be interpreted as the Legislature's abandonment of antiquated views represented in the law of rape as it existed when *Craig* was decided and, hence, at the time of the narrow holding of the court in that case. I find no rational reason to accept the majority's revival of those abandoned views.

    2. The sentencing process at the time of *Craig*

10

*Craig* also was faced at the time with resolving a serious sentencing concern that no longer exists, specifically how a defendant should be sentenced for multiple convictions arising out of a single act. At the time of *Craig*, the State Board of Prison Terms and Paroles (Board) was responsible for fixing the definite sentence term of defendants. The defendant in *Craig* was faced with *two judgments* for the same offense. The court sought to eliminate potential confusion and the prejudice of multiple punishment to the defendant if the Board saw there were two judgments and did not realize there was but a single act involved. The court solved this specter of multiple punishment by consolidating the judgments to ensure the Board was not confused and the defendant was not punished twice for the same act. (*Craig*, *supra*, 17 Cal.2d at pp. 458-459.)

Neither before nor immediately after *Craig* did section 654[5] provide any guidance regarding how to punish an act or omission made punishable by different provisions of the statute. Although, like the current version of section 654, the former version of that statute precluded multiple *punishment*, and while section 654, subdivision (a) now

---

[5] Former section 654, which was applicable when *Craig* was decided, provided: "An act or omission which is made punishable in different ways by different provisions of this Code may be punished under either of such provisions, but in no case can it be punished under more than one; an acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other. In the cases specified in Sections 648, 667 and 668, the punishments therein prescribed must be substituted for those prescribed for a first offense, if the previous conviction is charged in the indictment and found by the jury."

Section 654 was amended in 1976 to reflect the current version of the statute: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."

11

provides that the provision setting the longest potential term of imprisonment applies, there was, and is, no express provision in the statute allowing for a stay to avoid multiple punishment for crimes arising out of the same criminal act. Thus, clearly at the time *Craig* was decided, there was a serious need to carve out a uniform sentencing tool that would consistently avoid multiple punishment for the same act.

In understanding the resolution of the sentencing problem facing our courts at the time of *Craig,* I find particularly useful the decision of our high court in *People v. Pearson* (1986) 42 Cal.3d 351 (*Pearson*), which fully discusses the development of section 654 jurisprudence. That discussion leads me to conclude the sentencing disposition in *Craig* has been disapproved.

In *Pearson*, the court notes: "Some of our earlier decisions held that the imposition of concurrent sentences sufficiently protected the defendant from multiple punishment because he would be serving each of his sentences simultaneously. (See, e.g., *People v. Kynette* (1940) 15 Cal.2d 731, 761-762 [(*Kynette*)].) In other cases, however, we refused to affirm multiple convictions because of the possibility that such convictions would disadvantage the defendant when the Adult Authority fixed the date he would ultimately be released from prison. (See, e.g., *People v. Brown* (1958) 49 Cal.2d 577, 593; *People v. Logan* [(1953)] 41 Cal.2d 279, 290–291; cases cited in *People v. Smith* [(1950)] 36 Cal.2d 444, 448.) In *Neal v. State of California* [(1960)] 55 Cal.2d 11, we went so far as to indicate that multiple convictions were invalid per se. (*Id.* at p. 19 ['If only a single act is charged as the basis of the multiple convictions, only one conviction can be affirmed.'].)

12

"Our later cases, however, reaffirmed that section 654 bars multiple punishment, not multiple conviction. (*People v. Tideman* (1962) 57 Cal.2d 574, 586–587; *People v. McFarland* (1962) 58 Cal.2d 748, 762–763.) In *McFarland* we explained: 'With respect to the procedure to be followed on appeal where double punishment has been erroneously imposed, it should be stressed that section 654 proscribes double punishment, not double conviction; conduct giving rise to more than one offense within the meaning of the statute may result in initial conviction of both crimes, only one of which, the more serious offense, may be punished. [Citation.] The appropriate procedure, therefore, is to eliminate the effect of the judgment as to the lesser offense insofar as the penalty alone is concerned.' (*Ibid.*)

"In *People v. Niles* (1964) 227 Cal.App.2d 749, 756 [(*Niles*)], the Court of Appeal determined that the proper method of eliminating the punitive consequences of multiple convictions was to stay execution of sentence for all but one conviction arising out of each act or indivisible course of conduct. This procedure was developed to avoid the potentially unfair consequences to the state of refusing to allow multiple convictions: 'if [a trial court] dismisses the count carrying the lesser penalty, and the conviction on the remaining count should be reversed on appeal, the defendant would stand with no conviction at all.' (*Ibid.*)

"Soon after *Niles*, this court decided *In re Wright* (1967) 65 Cal.2d 650, in which we approved of the procedure the *Niles* court had developed. In *Wright* we reaffirmed the rule that section 654 does not prohibit multiple convictions, but also declared that it *does* bar concurrent sentences for such convictions. We reasoned that concurrent sentences still amounted to punishment under more than one provision, prohibited under section

13

654, and could prejudice the defendant in various ways: 'Under the habitual criminal statute [citation] defendant would be prejudiced by erroneous concurrent sentences for an offense subject to a lesser penalty but available to support a determination of habitual criminality . . . and an offense subject to a greater penalty but not listed in the habitual criminal statute . . . . [¶] 'Erroneous concurrent sentences for petty theft, with a maximum term of six months in jail [citation], and issuing a check not exceeding $100 without sufficient funds, with a maximum term of one year in jail [citation], would be detrimental to a defendant who suffered a *subsequent* conviction because he would be subject to the increased minimum punishments provided by Penal Code section 666 for one who has been previously convicted of petty theft and "served a term therefor in any penal institution."' (*Id.* at p. 654, fn. 2, italics added.)

"In *Wright* we therefore balanced the potential windfall to the defendant of reversing multiple convictions against the prejudice to him of allowing sentencing for such convictions. We then determined that the procedure of staying execution of sentence for multiple convictions instead of reversing such convictions 'reasonably reconciles the policies involved in applying section 654 to protect the rights of both the state and the defendant,' and follows logically from the section 654 prohibition against punishing the defendant under more than one provision based on a single criminal act. (*Id.* at pp. 655–656, fn. 4.)" (*Pearson*, *supra*, 42 Cal.3d at pp. 359-360.)

As explained by *Pearson*, I believe *Craig* reflects a sentencing problem that plagued our courts prior to *Wright*. It was a sentencing problem that saw inconsistent rulings by our Supreme Court. Indeed, a year before *Craig* was decided, as *Pearson* noted the *Kynette* court applied former section 654 to require sentences to run concurrently in order to

14

avoid double punishment after a defendant was convicted of attempted murder, assault with intent to murder and the malicious use of explosives, all of which convictions the court noted were "traceable to and [were] the direct result of the placing of a bomb in the automobile of the victim." (See *Kynette*, *supra*, 15 Cal.2d at pp. 761-762, overruled on another ground as stated in *People v. Snyder* (1958) 50 Cal.2d 190, 197.) In reaching its decision, *Kynette* noted "it would have been more in conformity with the legislative intent expressed in section 654 of the Penal Code to preclude more than one punishment for an act 'punishable in different ways by different provisions of this code,' if the court below had caused all three sentences to run concurrently rather than two of them, with the third running consecutively." (*Kynette*, at p. 762.) For reasons specific to each case, in *Kynette* the response of the court was to apply concurrent sentences, while in *Craig* the response was to consolidate the multiple convictions.[6]

Once *Niles* was decided in 1964, which introduced the concept of staying sentence and punishment for convictions otherwise appropriate under former section 654, clearly it was no longer necessary to consolidate multiple offenses into a single conviction or to ensure sentences from multiple convictions ran concurrently, as was the case in the 1940's when *Craig* and *Kynette* were decided. In light of this, I view *Craig* and *Kynette* as cases that are part of the history of inconsistency so meticulously set forth in *Pearson*.

---

6       As recognized by *Gonzalez*, the first count in *Craig* alleged the defendant committed the rape with force and violence, in violation of subdivision (3) of former section 261, and the second count, "*after alleging* [*in the information*] *that it was* '"*a different statement of the same offense*"' [citation] charged statutory rape of a child below the age of consent, in violation of former section 261, subdivision 1." (*Gonzalez*, *supra*, 60 Cal.4th at p. 538, italics added, quoting *Craig*, *supra*, 17 Cal.2d at p. 454.) Thus, perhaps *Craig* was decided differently than *Kynette* as a result of how the defendant in *Craig* was charged.

As I have noted, it is not an inconsistency I believe merits any argument that *Craig* should be overturned; rather, it is inconsistency attributable to a sentencing concern that has been remedied.

Unfortunately, the consolidation approach now employed by the majority, and the option to strike presented in *Smith*, negate much of the historical progress noted in *Pearson* and deliver us back to the inconsistency and confusion that existed before implementation of the stay procedure engrafted onto section 654 by *Niles* and approved by *Wright*. Indeed, the majority's use of *Craig* to consolidate counts, and *Smith*'s use of *Craig* to strike counts, potentially lead to the unintended consequences disapproved of in *Wright* and give a defendant the precise windfall our section 654 jurisprudence has, over the last 50 years, attempted to eliminate.

In my view, instead of consolidating and/or striking multiple rape offenses that are based on a single act, we are *compelled* to follow the rule set forth by our Supreme Court and a very long line of authority and stay punishment of one or more of such offenses under subdivision (a) of section 654, thus avoiding the risk of any unintended benefit to a defendant while preserving his or her right to be free of multiple punishment for the same act.

C. *Section 954 permits multiple convictions for different statements of an offense.*

Even assuming subdivisions (a)(3) and (a)(4)(A) of section 261 are *not* independent offenses, I would still conclude White was properly convicted of counts 1 and 2 in the instant case because section 954 permits conviction of "any number of the offenses charged" under that statute, including "different statements of the same offense or two or more different offenses of the same class of crimes or offenses."

16

My colleagues give scant regard to the plain language of section 954, yet it clearly allows for the charging that took place in this case. Giving the words in section 954 their ""plain and commonsense meaning""" (*Gonzalez*, *supra*, 60 Cal.4th at p. 537), I thus alternatively conclude White was properly convicted on *both* counts 1 *and* 2. (See *Pearson*, *supra*, 42 Cal.3d at p. 354 [concluding defendant was properly convicted for lewd conduct on a child and sodomy based on the singular act of sodomy because "such charges clearly constitute 'different statements of the same offense' and thus are authorized under section 954"].)

In sum, I conclude White was properly convicted in counts 1 and 2 of rape of an intoxicated person (former § 261, subd. (a)(3)) and rape of an unconscious person (*id.*, subd. (a)(4)(A)). I further conclude White's punishment in connection with count 2 was properly stayed under section 654, subdivision (a). In all other respects, I agree with the majority decision.

BENKE, Acting P. J.